[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-13073

_____

TYLER M. COPELAND,

Plaintiff-Appellant,

*versus*

GEORGIA DEPARTMENT OF CORRECTIONS,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 6:20-cv-00057-JRH-BKE

_____

Before WILSON, JILL PRYOR, and BRASHER, Circuit Judges.

JILL PRYOR, Circuit Judge:

Tyler Copeland is a transgender man who, for three years, was a sergeant at Rogers State Prison in Georgia. From the time Copeland came out as transgender at work until he filed this suit, Copeland endured constant and humiliating harassment. Coworkers called Copeland "baby girl." They went out of their way to call him "ma'am" on prison-wide radio communications and in front of inmates. They jokingly speculated he must have a dildo in his pants. They snickered, pushed him, and followed him. Dangerously, given his position and need to command respect from inmates, they disobeyed and undermined him. And this harassment came from all fronts—supervisors, subordinates, and peers alike—despite his repeated complaints to his supervisors, prison management, and human resources personnel.

Copeland sued, bringing three claims under Title VII of the Civil Rights Act of 1964. The district court granted summary judgment to Copeland's employer, the Georgia Department of Corrections ("GDOC"). In part, the district court concluded that Copeland's Title VII hostile work environment claim failed because the harassment he suffered was not sufficiently severe or pervasive. We disagree and vacate the summary judgment on that claim. We affirm the district court's judgment on Copeland's other claims.

## I.    BACKGROUND

Tyler Copeland became an employee of GDOC a decade ago.[1] A year after starting, he began working at Rogers State Prison, a medium-security prison located in southeast Georgia. Two years later, GDOC promoted Copeland to the rank of sergeant at Rogers.

Copeland is a transgender man, meaning that he was assigned the sex of female at birth, but he consistently and persistently identifies as a man. *See Glenn v. Brumby*, 663 F.3d 1312, 1314 (11th Cir. 2011). While working at Rogers, he began the process of medically and socially transitioning to align with his gender identity. He underwent hormone replacement therapy, obtained a legal name change, and decided to live openly as a man. This decision required him to disclose his gender identity at work.

To discuss his transition, he met with Becky Johnson, a human resources ("HR") employee at Rogers. He gave Johnson paperwork showing his name change, but she told him that he would need to furnish a birth certificate instead—one that "reflected [his] name change and gender change." Doc. 46-3 at 31.[2] Copeland successfully amended his birth certificate and gave it to Johnson. Again she told him to wait, this time for a meeting with Betsy Thomas, the HR director. Heeding Johnson's request, he refrained from

---

[1] Because the district court granted summary judgment against Copeland, we consider the record in the light most favorable to him, meaning we "credit [Copeland's] version if there is any evidence to support it." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1248 (11th Cir. 2013).

[2] "Doc." numbers refer to the district court's docket entries.

telling anyone at work that he had changed his name to Tyler and planned to live as a man, consistent with his gender identity.

Things went downhill from there. Thomas called Copeland and asked if he had "had the surgery" or planned to have it. *Id.* at 113 (internal quotation marks omitted). He told Thomas it was "nobody's business." *Id.* (internal quotation marks omitted). Meanwhile, he could hear people laughing on the other end of the call—a call he had assumed would be private. Copeland left the call with the impression that he "was now a laughing matter in the [HR] Department." *Id.*

Following the call, Thomas convened two in-person meetings: one with Copeland and one with the entire Rogers staff. At the first meeting, Thomas advised Copeland not to use the men's bathroom. At the second meeting, with Copeland present, Thomas, the warden, and the deputy warden addressed the staff, informing them of Copeland's transgender status. The staff was told to refer to Copeland using either male pronouns or by his title and last name: Sergeant Copeland. And Copeland was told that he should report any issues with coworkers to HR or to his supervisors.

According to Copeland, that meeting marked "the beginning of the [u]nlawful and sexual harassment" he "experience[d] at work." *Id.* In the year that followed, coworkers of all stripes repeatedly harassed Copeland.

Much of this harassment was remarkably unconcealed. Rogers staff operated a prison-wide radio system; all employees at the

22-13073                Opinion of the Court                5

facility carried radios and could hear transmissions on the system. After the meeting, Copeland's coworkers would finish their radio transmissions to him by calling him "ma'am," such that "the whole institution [could] hear it." *Id.* at 38 (internal quotation marks omitted); *see also id.* at 40 ("It began after that meeting."). They did this even though, as a sergeant, Copeland had a call sign on the radio system, so there was never any need to address Copeland with a gendered pronoun or an honorific.[3] These comments occurred "[o]n a daily basis"—three or four times each day —and came from Copeland's "[s]ubordinates" and "supervisors" alike. *Id.* at 39. One time, after a supervisor addressed him over the radio as a woman, Copeland heard subordinates down the hall laughing at him.

Off the radio, Copeland encountered gossip and harassing remarks throughout Rogers. One coworker commented that Copeland must have a "dildo" in "her" pants. Doc. 53-2 at 3. Others called him "that" and "it." Doc. 46-3 at 90. His direct supervisor taunted him and called him "baby girl." *Id.* at 115. Cafeteria staff members joked about transgender people and their genitalia in front of inmates. A nurse on the medical staff told Copeland that "she was not going to call [him] sir" because "that wasn't who [he] was." *Id.* at 92 (internal quotation marks omitted). And Copeland knew of similar conversations taking place among the prison's

---

[3] For example, Copeland's call sign at one point was L1B. Staff understood that "L1B" was Copeland. So an employee trying to speak to or about Copeland on the radio had no need to use "ma'am" or "sir" or even "Tyler" or "Sergeant Copeland."

maintenance staff. Often, and contrary to Thomas's directive at the staff meeting that staff refer to Copeland as Sergeant Copeland or use male pronouns, Copeland's supervisors called him "ma'am." They also commented on his gender in front of subordinates. Inmates joined in, "mak[ing] inappropriate comments" to Copeland about his gender identity. Doc. 53-2 at 3. All told, Copeland identified 34 coworkers who participated in harassing him.

Occasionally, these incidents escalated. During an overnight shift, as Copeland was entering the prison, another officer, Sheila Holland, blocked the doorway. Holland confronted Copeland, telling him, "[W]e can fight." Doc. 46-3 at 118. She told him that she was offended when he corrected colleagues who called him "ma'am" or "she" "because [she was] proud to be a woman." *Id.* (internal quotation marks omitted). A few days after, late in the evening, Holland "pushed" Copeland as he exited Rogers, drawing laughter from another sergeant. *Id.*; *see also* Doc. 46-5 at 55 (describing Rogers surveillance video showing Holland "pushing Copeland from behind" (capitalization altered)). As he walked to his car, she "circled . . . around" him in an "armed perimeter vehicle" while carrying a pistol. Doc. 46-3 at 118. She then "parked behind" him. *Id.* at 95. Copeland feared for his life.

Copeland repeatedly tried to stop the harassing conduct. For instance, he spoke with medical, cafeteria, and maintenance staff, seeking to end conversations in which they joked about him specifically and transgender people generally. After HR staff called Copeland "ma'am" in front of new cadets, Copeland explained to

the cadets that they should instead refer to him as Sergeant Copeland or with male pronouns. *Id.* at 43. And he regularly had "sidebar conversations" with those who misgendered him. *Id.* at 44.

In addition to addressing the harassment directly, Copeland—consistent with Thomas's instructions—reported concerns to supervisors and HR. He told his shift supervisors about the "constant harassment." *Id.* at 114. He spoke to HR manager Johnson when he felt his supervisors failed to take his concerns seriously. He contacted GDOC's "Employee Assistance Program" hoping to get access to alternative dispute resolution, therapists, and mediators, but he "never heard back." *Id.* He met with an HR assistant, Tracy Gay, to "reiterat[e] . . . concerns of harassment in the workplace." *Id.* at 115. He met with the warden. He sought—but did not receive—a meeting with the deputy warden. In short, he raised his concerns to Rogers's entire chain of command.

Copeland persisted for almost a year, but his efforts to address the harassment he faced at work failed. After he asked officers on his shift to use male pronouns or call him Sergeant Copeland, one supervisor criticized him for how he addressed his shift, warning that one of his officers could file a grievance against him. When Copeland met with other supervisors, they told him to give coworkers "more time to adjust." *Id.* (internal quotation marks omitted). After he raised concerns about his supervisors' handling of his HR complaints, HR suggested a meeting with the warden, but nobody followed up with Copeland and "[n]o meeting

occurred" until nearly four months later, when he met with the warden after once again complaining to HR. *Id*. Meanwhile, the harassment continued largely unabated.

Once the harassment began, Copeland's working conditions declined in other ways, too. He faced insubordination from officers he supervised. He was reassigned shifts more often than other coworkers, including being moved to the night shift —a less desirable posting. His supervisors refused to let him miss work to attend longstanding doctor's appointments. And he was not permitted to take a "promotional assessment test"—to allow him "more time" to prepare following a brief medical leave. *Id*. at 117–18.

Copeland began to seek other work, both within GDOC and elsewhere. Over the course of three years, he submitted "four or five" applications to be promoted to lieutenant at Rogers. *Id*. at 59. Within the broader GDOC system, he attempted to transfer to positions with Treutlen Probation Center and with GDOC investigations. Outside of GDOC, he applied for positions with the Federal Bureau of Prisons, the Georgia Department of Juvenile Justice, and Georgia Southern University's police department. Each prospective employer rejected him, and none gave him a reason why. He did not know who made hiring decisions for each position. But he knew that some of these potential employers contacted individuals at Rogers for character references. He feared that these references may have played a role in his inability to obtain a promotion or transfer.

After the incident in which Holland pushed, confronted, and later menaced Copeland, he emailed his captain, the deputy warden of security, and the warden about the incident. A few days later, a GDOC investigator, Jessica Moseley, contacted him to arrange an interview. He described to Moseley the incident with Holland, but he felt "the interview was not about the incident but rather finding a way to get [him] to incriminate [him]self." *Id.* at 119. Moseley conducted additional interviews with Holland and other Rogers personnel, reviewed surveillance video of Holland's encounter with Copeland, and prepared a report. Even though the video showed Holland "pushing Copeland from behind," Doc. 46-5 at 55 (capitalization altered), Moseley's report concluded that Copeland's allegations of sexual harassment and assault against Holland were "not sustained," *id.* at 4 (emphasis omitted).

At that point, Copeland lost his "faith in the internal affairs system" at GDOC. Doc. 46-3 at 48. Armed with a list he had been keeping of "major incidents that took place" at Rogers, *id.* at 37, he found a lawyer and filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC"). In the charge, he alleged that since the initial meeting at which he had come out as transgender, he had been subjected to "constant harassment" and "disparate treatment by [GDOC]," in violation of Title VII. Doc. 53-2 at 4 (emphasis omitted). The EEOC dismissed Copeland's charge of discrimination and notified him of his right to sue. Shortly after, GDOC promoted him to lieutenant.

Copeland sued GDOC in the Southern District of Georgia, bringing three claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*[4] Count I alleged that GDOC subjected Copeland to a hostile work environment because of his transgender status, violating 42 U.S.C. § 2000e-2(a)(1). Count II alleged that GDOC failed to promote Copeland because of his transgender status, violating 42 U.S.C. § 2000e-2(a)(1). And Count III alleged that GDOC retaliated against Copeland for engaging in a protected practice—opposing sex discrimination—violating 42 U.S.C. § 2000e-3(a).

GDOC moved for summary judgment, which Copeland opposed. The district court granted GDOC's motion on all counts. On Count I, the district court concluded that the harassment Copeland suffered was not objectively "severe or pervasive," so he failed to satisfy an element of this claim. Doc. 63 at 17; *see Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (explaining that conduct must be "sufficiently severe or pervasive to alter the conditions of the victim's employment" to be actionable under Title VII (internal quotation marks omitted)). It addressed Counts II and III—failure

---

[4] Copeland also brought one claim under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, alleging that GDOC failed to pay him overtime when he worked over 40 hours per week. The district court granted summary judgment to GDOC on this claim based on sovereign immunity. Because Copeland does not challenge that ruling in his appellate brief, we address this claim no further. *See United States v. Campbell*, 26 F.4th 860, 871 (11th Cir. 2022) (en banc) ("[I]ssues not raised in the initial brief on appeal are deemed abandoned.").

to promote and retaliation—together. It granted GDOC summary judgment on both counts because it concluded that Copeland could not "establish a causal connection between [Copeland's] protected activity and [GDOC's] decision not to promote" him. *Id.* at 21.

This is Copeland's appeal.

## II.    STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo*, applying the same legal standards that bound the district court. *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1345 (11th Cir. 2022). We affirm summary judgment only when the moving party "shows that there is no genuine dispute as to any material fact and . . . is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]hen determining whether there is a genuine issue of material fact[,] . . . we do not weigh conflicting evidence or make credibility determinations to resolve factual disputes." *Patterson*, 38 F.4th at 1350. Instead, we give the nonmovant the benefit of his evidence, "credit[ing] the nonmoving party's version" of events, even if it is supported "solely by the testimony of a party." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) (emphasis omitted) (internal quotation marks omitted).

We may affirm the district court's judgment on any ground supported by the record. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).

### III.    ANALYSIS

Copeland argues that the district court erred when it granted summary judgment to GDOC on his three Title VII claims. We agree in part. The district court erred when it concluded—on the summary judgment record—that Copeland had not suffered severe or pervasive harassment. We therefore vacate the summary judgment in GDOC's favor on Count I. We otherwise affirm.

#### A.  Hostile Work Environment

"[F]ew pieces of federal legislation rank in significance with the Civil Rights Act of 1964." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1737 (2020). Title VII of the Act makes it unlawful for a covered employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). This provision prohibits "requiring people to work in a discriminatorily hostile or abusive environment." *Harris*, 510 U.S. at 21.

To prevail on a hostile work environment claim, we require a plaintiff to prove five elements: (1) he "belongs to a protected group"; (2) he was "subject to unwelcome harassment"; (3) the harassment was "based on a protected characteristic"; (4) the harassment was "sufficiently severe or pervasive to alter the conditions of" his employment; and (5) his employer was "responsible for" the hostile work environment. *Bryant v. Jones*, 575 F.3d 1281, 1296 (11th Cir. 2009). Only the fourth element is at issue here. GDOC does

22-13073               Opinion of the Court                 13

not argue that Copeland—a transgender man who was harassed about his gender after coming out at work—has failed to satisfy the first three elements. Wisely so: discrimination against transgender individuals like Copeland is discrimination "because of sex." *Bostock*, 140 S. Ct. at 1743. And the district court did not address the fifth element, GDOC's responsibility; it granted GDOC summary judgment on the sole basis that Copeland failed to show severe or pervasive harassment.

The severe-or-pervasive element ensures that a hostile work environment claim remains faithful to the text of Title VII. It makes actionable only a work environment sufficiently suffused with "intimidation, ridicule, and insult . . . to alter the conditions of the victim's employment." *Harris*, 510 U.S. at 21 (internal quotation marks omitted). This standard does not require a plaintiff to suffer a "serious effect on [his] psychological well-being" nor even a "tangible effect[]" on his job performance before suing. *Id.* at 20, 22. But nor does it permit Title VII to operate as a "civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). Instead, it charts "a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Harris*, 510 U.S. at 21.

The severe-or-pervasive element has two subrequirements: one subjective and the other objective. *Bryant*, 575 F.3d at 1297. To satisfy the subjective requirement, a plaintiff must "subjectively perceive[]" the hostile work environment "to be abusive." *Miller v.*

14                    Opinion of the Court                    22-13073

*Kenworth of Dothan*, 277 F.3d 1269, 1276 (11th Cir. 2002) (internal quotation marks omitted). The district court concluded on the summary judgment record that Copeland satisfied the subjective requirement, and GDOC does not challenge that conclusion on appeal.[5] Where Copeland's claim failed (and where the parties focus their attention) is on the objective component, which requires a plaintiff to show "an environment that a reasonable person would find hostile or abusive"—that is, one where severe or pervasive harassment of the victim occurs. *Id.* (internal quotation marks omitted).

We consider four factors to determine whether harassment of an employee meets this objective requirement: (1) its frequency, (2) its severity, (3) whether it is "physically threatening or humiliating," and (4) whether it "unreasonably interferes with . . . job performance." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc). Although these factors guide our inquiry, they are neither elements nor requirements. *See Bryant*, 575 F.3d at 1297

---

[5] Even if GDOC had challenged it, we would agree with the district court that a reasonable jury could conclude that Copeland "subjectively believed the conduct at the prison" was abusive. Doc. 63 at 13. At various times Copeland "was in fear [for his] life," Doc. 46-3 at 118, and perceived that his coworkers' actions put "his safety [at] exceptional risk," Doc. 53-2 at 3. He made numerous complaints over the course of many months to his supervisors regarding what he perceived as constant harassment. And he filed an EEOC charge of discrimination, as well as this lawsuit. Taken together, this evidence easily satisfies Copeland's summary judgment burden of showing that he "subjectively perceive[d]" his work environment as "abusive." *Miller*, 277 F.3d at 1276 (internal quotation marks omitted).

("[T]he objective element is not subject to mathematical precision . . . ."). Instead, our task is to "determine under the totality of the circumstances whether the harassing conduct . . . alter[ed] the terms or conditions of the plaintiff's employment." *Mendoza*, 195 F.3d at 1246. This inquiry is highly contextual. *See Oncale*, 523 U.S. at 81–82 ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances . . . ."). Accordingly, as the Supreme Court has emphasized, "'no single factor' is necessary to satisfy the objective inquiry of a hostile work environment claim." *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1155 (11th Cir. 2020) (quoting *Harris*, 510 U.S. at 23); *see also Miller*, 277 F.3d at 1276 (explaining that "focusing on [a] single factor . . . loses sight of the totality of the circumstances approach").

Thus, for example, harassment may violate Title VII without interfering with an employee's performance. *Fernandez*, 961 F.3d at 1155. And infrequent but severe instances of harassment may support a claim. *See Adams v. Austal, U.S.A., LLC*, 754 F.3d 1240, 1254 (11th Cir. 2014) ("Although his supervisor's carving was an isolated act, it was severe.") The same goes for frequent but less severe harassment. *See Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) (en banc) ("Either severity *or* pervasiveness is sufficient to establish a violation of Title VII." (emphasis in original)).

Joined by the United States as amicus curiae, Copeland argues that the district court erred when it decided that he failed to present evidence from which a reasonable jury could conclude that

the harassment he faced was sufficiently severe or pervasive to meet this test. We agree with Copeland and the United States. We discuss in turn the application of each factor and then consider the totality of the circumstances.

> 1.    The Harassment Was Frequent.

First, frequency. Our precedents, although they guide us, establish no "magic number" of instances of harassment sufficient to qualify as frequent. *Miller*, 277 F.3d at 1276 (internal quotation marks omitted). In the past, we have treated 15 instances of harassment in four months as "not infrequent," *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000), "more than 10" specific instances in two months as "frequent," *Fernandez*, 961 F.3d at 1153, and five instances over an 11-month period as "too infrequent," *Mendoza*, 195 F.3d at 1250. But wherever the boundary may lie, a jury crediting Copeland's testimony could find that his harassment well surpassed it.

Copeland identified 34 individuals he says harassed him at work. In his deposition, he described how each of these individuals participated in his harassment. He identified a list of instances of harassment he prepared that spans seven typed pages. And, significantly, he testified that the radio harassment he experienced occurred "daily"—"three or four" times each day for at least a year. Doc. 46-3 at 39, 102. Undoubtedly, conduct that occurs daily (even over a shorter span of time) is frequent. *See Miller*, 277 F.3d at 1276.

The district court dismissed as "conclusory" Copeland's testimony that his coworkers regularly harassed him over the radio.

Doc. 63 at 15. It said that Copeland's testimony about daily radio harassment did not match up with the "enumerated occurrences" on Copeland's seven-page list. *Id.* The district court thus limited its analysis to 17 incidents it identified on the list.

We have cautioned district courts against discounting testimony in this way at the summary judgment stage. *See Fernandez*, 961 F.3d at 1153–54 (rejecting defendant's argument that plaintiff's testimony that he was harassed "nearly every day was conclusory" (internal quotation marks omitted)). In *Feliciano*, we reversed the district court, which had rejected a plaintiff's testimony as conclusory. 707 F.3d at 1253 We explained that "a plaintiff's testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature." *Id.*

Copeland's testimony is none of these things. He never contradicted himself. He maintained throughout his deposition that the radio harassment occurred "constantly" or "on a daily basis." Doc. 46-4 at 44, 57; *see also id.* at 37 ("constant" and "daily basis"), 39 ("daily basis"), 102 ("three or four times" daily). Nor was his testimony undermined by other parts of the record, as the district court supposed. Although Copeland did not catalog the radio harassment in his contemporaneous list, he explained in his deposition that the list contained only "major incidents." *Id.* at 37. He testified that he "did not include" the radio harassment in the list because it

was "constant" and documenting it would have been "tedious." *Id*. And given that he identified 34 individuals who he says participated in harassing him and that he frequently complained to HR and his superiors, it is not incredible that he suffered daily harassment. By discounting Copeland's testimony about the frequency of the harassment he faced, the district court improperly denied him the benefit of his evidence at the summary judgment stage. When we consider this testimony, we easily conclude that a jury crediting Copeland's evidence could find that the harassment Copeland faced was frequent.

   2.    The Harassment Was Severe.

   Second, we turn to severity. Considering factors our circuit has traditionally endorsed, we conclude that Copeland has put forward evidence sufficient to enable a reasonable jury to conclude that the harassment was severe. A reasonable jury could find that the harassment continued despite Copeland's objections, supervisors participated in the harassment, and the harassment took place in the correctional context.

   Our cases have long recognized that harassment is more severe when it occurs "despite the employee's objections." *Miller*, 277 F.3d at 1276 (internal quotation marks omitted); *see also Fernandez*, 961 F.3d at 1154 (concluding that harassment was severe in part because it "persisted . . . despite . . . employees' complaints); *Reeves*, 594 F.3d at 812 (noting, in concluding that evidence showed severe harassment, that a "manager accepted and tolerated [harassment] over [the employee's] repeated complaints" (internal quotation

marks omitted)). Copeland repeatedly objected—without success—to his coworkers' treatment of his gender. He confronted coworkers directly. *See, e.g.*, Doc. 46-3 at 114 ("I stated to him . . . 'I would appreciate it if you would not embarrass me on the radio like that again.'"). He told his shift supervisors about the harassment he faced and spoke to HR multiple times when he felt that his supervisors failed to take his concerns seriously. He even met with the warden. But, as we have described, these efforts failed to abate the harassment.

Harassment is also more severe when it involves the participation of supervisors rather than solely peers or subordinates. As the Supreme Court has explained, "an employee subjected to a supervisor's . . . harassment . . . may well be reluctant to accept the risks of blowing the whistle on a superior" who has the power to "hire and fire, and to set work schedules and pay rates." *Faragher v. City of Boca Raton*, 524 U.S. 775, 803 (1998) (internal quotation marks omitted). Thus, when "measuring the severity of harassing conduct," courts have recognized that "a supervisor's [actions impact] the work environment far more severely than [those of] co-equals." *Boyer-Liberto v. Fontainbleau Corp.*, 786 F.3d 264, 278 (4th Cir. 2015) (en banc) (internal quotation marks omitted); *accord Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1247 (11th Cir. 2004) (acknowledging that harassment by a supervisor is more likely "to be physically threatening and humiliating"). It is true that some harassment Copeland experienced came from his subordinates. But supervisors participated in harassing him, too. Lieutenant Dickson, for example, "taunt[ed]" Copeland and repeatedly called him "baby

girl." Doc. 46-3 at 115. Lieutenant Davis unnecessarily and gratuitously addressed Copeland over the radio with female pronouns while other employees laughed. When Copeland asked Davis to stop, Davis laughed, too. These supervisors' participation would allow a reasonable jury to conclude that the harassment was severe.[6]

In determining whether harassment is severe, precedent also requires our "careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale*, 523 U.S. at 81. We conclude the context in which Copeland was harassed—while working as a correctional officer—makes the harassment he faced more severe. The correctional context is dangerous and sometimes violent—dramatically more so than the typical workplace. *See* Srinivas Konda et al., *U.S. Correctional Officers*

---

[6] At oral argument, GDOC argued that the harassment was not severe because Copeland could have disciplined his subordinates who participated. GDOC's argument overlooks the participation of Copeland's supervisors. It also ignores critical context that Supreme Court precedent requires us to consider in analyzing severity. *See Oncale*, 523 U.S. at 81. Copeland's evidence shows that he did not sit idly by as subordinates engaged in harassment; he often sought to correct those who misgendered or disobeyed him. But he was stymied by supervisors, who criticized him for how he addressed his subordinates and told him that he should give them more time to adjust. Further, HR personnel directed Copeland to report harassment to them and to his supervisors rather than taking direct action against his subordinates. He heeded that directive. Finally, as we have described, supervisors modeled the harassing behavior in which subordinates engaged. We will not overlook harassment by subordinates when supervisors have a hand in modeling and perpetuating that harassment.

*Killed or Injured on the Job*, 75 Corrs. Today 122 (2013) (finding that correctional officers experience injuries due to assaults and violent acts at a rate 36 times greater than other workers). Indeed, at the time of his deposition, Copeland was on medical leave after an inmate attacked him, injuring his leg. In this context, singling out an employee for harassment sends the message to coworkers that the victim need not receive the support and cooperation necessary to remain safe. It sends the message to inmates that the victim is fair game. *See Jemmot v. Coughlin*, 85 F.3d 61, 67 (2d Cir. 1996) (concluding that by "humiliating [a correctional officer] in front of prisoners he [was] required to control," coworkers had "put him in danger of physical harm").

Together, these considerations persuade us that Copeland has created a genuine issue of material fact whether the harassment he endured was severe. In contrast, the district court concluded, largely without explanation, that the harassment Copeland faced was "simple rudeness and discourtesy"—statements insufficiently severe to alter Copeland's conditions of employment. Doc. 63 at 15. We disagree.

When viewed in the light most favorable to Copeland, the record fails to support the district court's conclusion that the harassment here amounted to "simple rudeness." *Id.* Coworkers joked about Copeland having a "dildo" in "her" pants, Doc. 53-2 at 3; they pushed him; they called him "it" and "that" (in addition to "ma'am"), Doc. 46-3 at 90; they disobeyed his commands; and they went out of their way to broadcast their comments over a facility-

wide radio system daily. On these facts, a reasonable jury could determine that these comments were not inadvertent, accidental, or in good faith, but intentionally insulting and degrading. It could therefore conclude that Copeland faced severe harassment based on a protected characteristic.

### 3.    The Harassment Was Physically Threatening and Humiliating.

Third, we address whether the harassment was physically threatening or humiliating. Crediting Copeland's version of events, a reasonable jury could find it was both.

Copeland put forward evidence that he faced physically threatening harassment in his interactions with Holland. According to Copeland, Holland said, "[W]e can fight," while blocking Copeland's path. Doc. 46-3 at 118. Holland pushed Copeland. Then, while carrying a gun, she followed him outside, circled him in an armed vehicle, and parked behind him. Copeland perceived this conduct as physically threatening: he testified that he feared for his life and immediately notified his supervisors of what had happened.

Rather than credit Copeland's version of events, the district court relied on the conclusions of GDOC's investigation—that Holland acted in a "joking" and "friend[ly]" manner. Doc. 63 at 16 (internal quotation marks omitted). But the evidence underlying GDOC's investigation partly corroborated Copeland's story: surveillance video GDOC reviewed showed Holland pushing Copeland from behind. Where GDOC's investigation reached

conclusions that diverged from Copeland's testimony, the conclusions were largely based on differing statements by Copeland, Holland, and another witness. On summary judgment, however, the district court may not take sides in a "swearing match" between the parties, "which is the stuff of which jury trials are made." *Feliciano*, 707 F.3d at 1253; *see also Hulsey*, 367 F.3d at 1240–42 (crediting a plaintiff's version of events at the summary judgment stage notwithstanding that the employer's internal investigation did "not corroborate [her] allegations").

The harassment Copeland suffered was also humiliating. As we have recognized, harassment that occurs "in the presence of coworkers" is especially humiliating. *Fernandez*, 961 F.3d at 1155. Copeland's coworkers harassed him over the prison radio system, so "the whole institution [could] hear." Doc. 46-3 at 38. He knew his coworkers were listening; he heard them laughing. He often had to explain his transgender status after being misgendered in front of subordinates.

In another context, this Court has acknowledged that "most people have a special sense of privacy in their genitals." *Adams v. Sch. Bd. of St. John's Cnty.*, 57 F.4th 791, 805 (11th Cir. 2022) (en banc) (internal quotation marks omitted). Copeland's coworkers transgressed this boundary in a humiliating way. He heard HR staff laughing at him during a call in which Thomas asked if he had undergone genital surgery, leaving him feeling that he was "a laughing matter in the [HR] [d]epartment." Doc. 46-3 at 113. And one

coworker joked that Copeland must have a "dildo" in "her" pants. Doc. 53-2 at 3.[7]

    4.    The Harassment Negatively Impacted Copeland's Job Performance.

Fourth is the harassment's impact on Copeland's job performance. At the outset, we acknowledge that Copeland eventually received a promotion from sergeant to lieutenant, which suggests that his job performance had been satisfactory. But the summary judgment record contains evidence from which a reasonable jury could conclude the harassment did in fact negatively interfere with Copeland's job performance.

This evidence supports an inference that the harassment undermined Copeland's authority and his ability to command the obedience of subordinates within Rogers's rank structure. Holland, following her confrontation with Copeland, refused to give him keys he needed to transfer inmates out of Rogers. Another subordinate who, according to Copeland, called him "it" and "that" in addition to "ma'am," refused to serve disciplinary papers on inmates as Copeland ordered. Doc. 36-3 at 90. When he reported these instances of insubordination to his supervisors, they generally took no action, sending the message that insubordination directed at him was acceptable. Inmates participated in harassing Copeland,

---

[7] The district court claimed—without elaboration—that "there is no evidence of any humiliation of Plaintiff." Doc. 63 at 16. Considering our analysis of the summary judgment record, we disagree.

too, further supporting a conclusion that his mistreatment deeply diminished his status and authority at Rogers.

\* \* \*

At last, guided by our discussion of the four factors, we consider whether, under the totality of the circumstances, a reasonable jury could conclude that the harassment Copeland faced was objectively severe or pervasive enough to alter the terms or conditions of his employment. *See Mendoza*, 195 F.3d at 1246. We are more than satisfied that it could. Each of the four factors favors a finding of severe or pervasive harassment—two (frequency and humiliation) strongly so. According to Copeland's evidence, accepted as true at summary judgment, each day, when he reported to work, his supervisors, subordinates, and peers publicly humiliated him because his gender identity differs from the sex he was assigned at birth. They did so notwithstanding his complaints to every level of prison leadership. Title VII does not countenance such behavior. The district court therefore erred by granting summary judgment to GDOC because the harassment was not sufficiently severe or pervasive.

Copeland has met his summary judgment burden as to the first four elements of a hostile work environment claim, but there is a fifth element. He still must show that GDOC was "responsible for the hostile work environment," whether "under either a theory of vicarious or direct liability." *Miller*, 277 F.3d at 1278.

GDOC argued below that it was not responsible for the hostile work environment because it took prompt action to address

the harassment. Because the district court found that the harassment was not sufficiently severe and pervasive, it did not address this element, and GDOC has not briefed it on appeal. Under these circumstances, we decline to address it in the first instance. After all, "we are a court of review, not a court of first view." *Stansell v. Revolutionary Armed Forces of Colom.*, 45 F.4th 1340, 1348 (11th Cir. 2022) (alterations adopted) (internal quotation marks omitted). Instead, we vacate the grant of summary judgment on Count I and leave it to the district court to address this fifth element on remand.

## B.  *Failure to Promote*

Count II of Copeland's complaint alleged that GDOC failed to promote Copeland because of his transgender status, violating 42 U.S.C. § 2000e-2(a)(1). The district court considered this claim alongside the retaliation claim alleged in Count III, reasoning that both claims failed because Copeland could not "establish a causal connection between . . . protected activity and the decision not to promote" him. Doc. 63 at 21. The district court erred in its treatment of Count II because it analyzed this claim under the wrong legal standard. The error was harmless, however, because even under the proper legal standard, Copeland's Count II fails. We therefore affirm the district court's grant of summary judgment on this count. *See Thomas*, 506 F.3d at 1364 ("We may affirm the district court's judgment on any ground that appears in the record, whether or not that ground was relied upon or even considered by the court below.").

Section 2000e-2(a)(1) makes it an unlawful employment practice for a covered employer like GDOC to "fail or refuse to hire . . . any individual . . . because of" a protected characteristic, like transgender status. *See Bostock*, 140 S. Ct. at 1737. Copeland alleged that GDOC violated this requirement because it refused to promote him because of his transgender status. To prevail on this claim, Copeland was not required to show that he engaged in protected activity or that such activity was the cause of GDOC's failure to promote him. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086–91 (11th Cir. 2004) (allowing failure-to-promote claim to go forward at summary judgment without imposing such requirements), *abrogated on other grounds by Lewis v. City of Union City*, 918 F.3d 1213 (11th Cir. 2019) (en banc). Those requirements, when they exist, derive from the text of the separate anti-retaliation provision at issue in Count III, 42 U.S.C. § 2000e-3(a), which makes it an unlawful employment practice to "discriminate against any individual . . . because he has opposed any practice made an unlawful employment practice by" Title VII. The district court thus had no reason to analyze whether Copeland had engaged in protected activity and could show a causal connection between that activity and the decision not to promote him in the context of Count II.

But Copeland was required to show that GDOC acted "because of . . . sex." 42 U.S.C. § 2000e-2(a)(1). The district court's application of an erroneous causation standard was harmless because he cannot make this showing. One way a Title VII plaintiff can survive summary judgment is by making out a prima facie case of discrimination under the burden-shifting framework the Supreme

Court first set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, plaintiffs alleging discriminatory failure to promote generally must introduce evidence showing that "other equally or less qualified employees who were not members of the protected class were promoted" instead. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1539 n.11 (11th Cir. 1997). Copeland alleged that, instead of promoting him, GDOC hired equally qualified individuals who are not transgender. But he presented no evidence to support this allegation at the summary judgment stage: there is no evidence at all about those GDOC hired, who did the hiring, or what qualifications were considered. That failure is fatal because, faced with a motion for summary judgment, a "party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," loses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). And the necessary showing cannot be made on "the mere pleadings themselves." *Id.* at 324. We therefore affirm the district court's grant of summary judgment to GDOC on Count II.[8]

---

[8] Of course, relying on the *McDonnell-Douglas* framework is not the only way for a Title VII plaintiff to survive summary judgment. *See Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 944–45 (11th Cir. 2023). As an alternative to proceeding under *McDonnell Douglas*'s framework, a plaintiff may present direct evidence of discrimination (something lacking here) or "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* at 946 (internal quotation marks omitted). In some cases, a plaintiff's failure to prove a prima facie case under *McDonnell Douglas* "often also reflects a failure of the overall evidence." *Id.* We are satisfied this is

### C. Retaliation

Count III of Copeland's complaint alleged that GDOC retaliated against him for engaging in a protected practice—namely, opposing sex discrimination—violating 42 U.S.C. § 2000e-3(a). Similar to the discrimination claim in Count II, Copeland had no direct evidence of retaliatory intent and instead relied on the *McDonnell-Douglas* framework. To establish a prima facie case of retaliation at the first step of that framework, Copeland bore the burden of showing that "(1) [he] engaged in an activity protected under Title VII; (2) [he] suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). The district court granted summary judgment to GDOC on this count, concluding Copeland failed to establish a prima facie case. We affirm because Copeland cannot succeed on the third element of the prima facie case, causation.

There is no question that Copeland satisfied the first element: he engaged in protected activity by advocating against his harassment, filing an EEOC charge, and filing this lawsuit. *See* 42 U.S.C. § 2000e-3(a). But the parties dispute what forms of alleged retaliation satisfy the second element, which makes actionable only "adverse employment action[s]," *Crawford*, 529 F.3d at

---

such a case. Copeland's inability to present *any* evidence about those GDOC hired in his stead, who made the hiring decisions, and what factors they considered amounts to a failure to present a case from which a reasonable jury could find that GDOC failed to promote Copeland because he is transgender.

970—those that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted). According to GDOC, the only alleged instance of retaliation that even arguably satisfies this element is GDOC's failure to promote Copeland until after the resolution of his EEOC charge. In contrast, Copeland argues that GDOC is liable for retaliation not just for failing to promote him but also because he faced "increased harassment, hostile work environment," actual and threatened "discipline," and worsening working conditions—like his reassignment to less desirable shifts. Appellant's Br. 33.

The only "adverse action" Copeland argued in the district court, however, was "GDOC refusing to transfer or promote him." Doc. 63 at 18; *see also* Doc. 58 at 14 (arguing that GDOC's "refusal to transfer or promote Copeland . . . forms the basis of Copeland's retaliation" claim). Absent exceptional circumstances, "an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court." *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) (internal quotation marks omitted); *cf. United States v. Campbell*, 26 F.4th 860, 871–875 (11th Cir. 2022) (en banc) (same for issues not raised in opening brief on appeal). We therefore consider only GDOC's allegedly retaliatory failure to promote (or transfer) Copeland.

As to GDOC's decision not to promote him, Copeland fails at the third element, causation. The causal-connection requirement mandates a showing that "the protected activity and the

adverse action were not wholly unrelated." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000) (internal quotation marks omitted), *abrogated on other grounds by Burlington*, 548 U.S. 53. But a retaliation claim must reflect actual, subjective—not constructive—discrimination; thus, Copeland had to present evidence that would allow a jury to find that "the decision-makers were aware of the protected conduct." *Id.* (alterations adopted) (internal quotation marks omitted). He failed to do so.

In his deposition, Copeland admitted that he did not know "who ultimately made the decision" not to hire him "for each of the positions" within GDOC that he sought. Doc. 46-3 at 64. And he admitted that he could only "speculate" as to whether any decisionmaker knew of his protected conduct. *Id.*; *see also Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (observing that, at the summary judgment stage, "[s]peculation does not create a genuine issue of fact" (emphasis omitted) (internal quotation marks omitted)).

It is true—as Copeland argues—that a plaintiff may show a causal connection through temporal proximity. If a form of protected activity and subsequent adverse action occur "very close" in time to one another, a jury may infer that the decisionmaker knew of the protected activity and that it served as one motivation for the adverse action, establishing causation. *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1182 (11th Cir. 2010) (internal quotation marks omitted). But Copeland cannot rely on temporal proximity because, setting aside his pleadings and briefs, *see Celotex*, 477 U.S.

at 324, he has submitted no evidence of when he actually applied for and failed to receive the promotions he claims GDOC withheld as retaliation for his protected activity.

Because Copeland failed to come forward with evidence of causation, we conclude that he failed to establish a prima facie case of retaliation and thus affirm the district court's grant of summary judgment in favor of GDOC on Count III of the complaint.[9]

## IV.    CONCLUSION

We **VACATE** the district court's grant of summary judgment on Count I of the complaint and **REMAND** for the district court to consider the fifth element of Copeland's hostile work environment claim, GDOC's liability. We otherwise **AFFIRM** the district court's summary judgment ruling.

**VACATED AND REMANDED IN PART, AFFIRMED IN PART.**

---

[9] A plaintiff relying on circumstantial evidence of retaliatory intent also may survive summary judgment by presenting evidence of a convincing mosaic of circumstantial evidence that would allow the jury to infer intentional retaliation by the employer. *See Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1311–12 (11th Cir. 2023). Given that Copeland could not identify the decisionmakers who decided not to promote him and had no evidence about whether those decisionmakers knew of his protected conduct, we cannot say that he came forward with sufficient evidence to survive summary judgment under a convincing-mosaic theory. *See Tynes*, 88 F.4th at 946.