**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 23-14175

————————————

CLENNON DEWAYNE MELTON,

*Plaintiff-Appellant,*

*versus*

I-10 TRUCK CENTER INC,
BRIAN BRIGMAN,
JASON BRIGMAN,

*Defendants-Appellees.*

————————————

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 3:21-cv-03061-MCR-ZCB

————————————

Before WILLIAM PRYOR, Chief Judge, and BRANCH and ABUDU, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal requires that we decide whether an employee's complaint of a racially hostile work environment can be supported by evidence of discrimination in his workplace against all racial minorities. Clennon Melton, a black man, alleges that he was terminated from his sales job at I-10 Truck Center because of his race and in retaliation for his complaints of racial discrimination and that he suffered a racially hostile work environment. The district court granted summary judgment for I-10. Although Melton failed to present substantial evidence to support his claims of discriminatory or retaliatory termination, he provided substantial evidence to support his claim of a hostile work environment. We affirm in part and vacate in part and remand for further proceedings.

## I. BACKGROUND

In this appeal from a summary judgment, we view the record and draw all reasonable inferences "in the light most favorable to the non-moving party." *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002).

Clennon Dewayne Melton is a black man who began working at I-10 Truck Center in March 2020. I-10 is a Florida commercial truck sales business owned by Brian Brigman. Brigman also owns a related business, I-20 Truck Sales, LLC, located in Alabama. Brigman's son, Jason Brigman, participated in management decisions at I-10, though he had no official role. Joseph Andrews, who began working at I-10 in 2016, was Melton's direct supervisor. All employees at I-10, except for Melton, were white.

Melton worked as a truck salesman. Melton's sales performance was largely consistent throughout his employment. He sold, showed, and washed trucks, among other tasks. He also prepared some paperwork that accompanied sales. I-10 expected Melton to work 40 hours a week and allowed him 5 paid vacation days a year after he completed a year of work. Melton was also required to clock in and out of work; Andrews was not.

Melton's workplace was replete with racial hostility. Melton "regularly" observed the Brigmans and Andrews make derogatory comments about all nonwhite customers. Andrews refused to serve nonwhite customers if he could instead pass them off to Melton. Brian Brigman referred to "dark-skinned customers from India as 'dot heads,'" and Andrews referred to "dark-skinned customers from the Middle East as 'rag heads.'" Melton states that it was "a normal practice" for the Brigmans, Andrews, and other employees to "use[] racial slurs to refer to Asian and dark-skinned Hispanic customers." The employees around Melton treated these remarks as jokes and "often laughed when they used offensive language." Nearly every time a black customer paid in cash, the Brigmans and Andrews suggested that the customer "must have gotten the money from an illegal activity." They made no similar comments about their white customers. Jason Brigman told Melton more than once that "a nonwhite customer from a foreign country would pretend not to understand English until they were speaking about money and then would speak perfect English." Melton complained to Brian Brigman about these comments, but Brian Brigman took no corrective action, and Jason Brigman did not change his

behavior. Because Melton "heard such language . . . nearly every time a nonwhite customer entered I-10," and because nonwhite customers entered "frequently," Melton felt racial hostility toward customers was a "normal practice" at I-10. The comments became "a source of stress and anxiety that made it more difficult for [Melton] to do [his] job."

I-10 employees also used racial slurs to discuss Melton behind his back. Some employees referred to him as "token" as a kind of "running joke" about the lack of diversity at I-10. They also referred to him as "n*****." And in a Facebook group chat with several I-10 employees, including Andrews, employees described Melton using racial slurs, including calling him "THAT N*****." The Brigmans were unaware of this group chat before discovery.

A few months after Melton started his employment, his supervisors noticed deficiencies in his performance. Attendance logs establish that he missed three full days of work in 2020 and missed several hours of work on seven other days. In 2021, he missed nine full days of work as well as portions of two other days. Internal emails beginning in July 2020 record errors in Melton's paperwork, missing invoices, and late filings. [In late May 2021, Melton neglected to record the details of a truck in the inventory manager or relay details of a sale to others.

On April 9, 2021, Melton and Andrews had a heated argument about a sale commission. Melton believed that Andrews had deprived him of opportunities to make his full commission on "multiple occasions." On this occasion, I-10 gave half the

commission to Andrews, despite Melton having spent much more time with the customer. The discussion turned into a yelling match that ended with Andrews saying "Boy, you'd better get out of my office." Melton complained to Brian Brigman, who overhead the fight, about the use of the term "boy" and the racially charged comments Andrews had made about customers. Brigman reprimanded both Melton and Andrews for "argu[ing] with another employee," but took no action to punish Andrews's alleged racist behavior.

Andrews accepted the correction, but Melton did not. He responded that his treatment at I-10 had been unfair because he had been "threaten[ed] and belittle[d]" and blamed for workplace problems. He suggested that Andrews's receiving an identical punishment was an "example of the buddy system" between Andrews and Brian Brigman.

After this incident, Melton overheard a conversation between Andrews and Jason Brigman in which Brigman told Andrews that "they were going to get rid of [Melton] but they had to do it the right way." Melton perceived this comment to mean they planned to "justify [his] termination as retaliation for [his] complaints about discrimination." Later that month, Andrews was promoted to Melton's manager.

Andrews and Jason Brigman began recording Melton's performance issues. Andrews emailed the Brigmans his account of the April 9 incident the next day. He suggested that Melton had "insinuat[ed] he wanted things to get physical" and that he was "not comfortable having an employee like that under [him] nor working

beside [him]." He listed several other "issues" with Melton, including "lazy work, insubordination, attendance issues, lack of team effort, lack of communication, paperwork issues, and now a lack of respect for a boss." He recommended that Melton be "reprimanded and/or terminated immediately." Brian Brigman did not approve that recommendation. Internal emails establish that over the next few months, both Andrews and Jason Brigman recorded performance issues, ranging from paperwork errors to issues with customer communication.

The conflict "escalated" over the summer. Melton's compensation was changed from a salary to hourly pay. He was criticized for performing his work the same way he had performed it before April 9. I-10 also adopted stricter policies on paperwork and attendance. It instituted a new attendance policy in May, with a limited number of vacation days, which Melton had already exhausted for the year. On May 12, 2021, counsel for Melton emailed the Brigmans and Andrews alleging "unfair treatment in the workplace" and complaining that Melton had overhead the Brigmans referring to a customer and to Melton as "stupid n*****s." In June, Jason Brigman warned Melton, Andrews, and other employees that paperwork was being done multiple times and that "[t]his has got to stop."

The day before Melton was fired, one of Melton's customers came to I-10 to pick up a truck. But the truck was at I-20 in Alabama, hundreds of miles away. The sales manager at another business, who had sent the customer to I-10 to pick up the truck,

23-14175               Opinion of the Court                    7

emailed Andrews to complain. Andrews then forwarded the email to Jason Brigman, who texted Melton, stating that he "ha[s] never had so much confusion" with another employee. He told Melton, "Let's just agree that it's not working. You don't like the way we do things. We don't like the way you do things." Andrews reported to another coworker that Jason Brigman had instructed him to "get a game plan with Brian to get [Melton] gone today."

On August 6, 2021, Brian Brigman called Melton to his office for a disciplinary meeting, which Jason Brigman joined by phone. No one used any racial slurs during the meeting, to which Andrews was not invited. The outcome of the meeting is disputed. Melton contends he was fired at this meeting, but the Brigmans maintain that he quit. In any event, the Brigmans agreed Melton was fired for the purposes of summary judgment. I-10 replaced Melton with a white employee.

Melton sued I-10 and the Brigmans in the district court for racial discrimination, retaliation against protected activity, and a racially hostile work environment. He relied for each of these claims on the federal law barring racial discrimination in contracting. *See* 42 U.S.C. § 1981. The district court granted I-10 summary judgment.

## II. STANDARD OF REVIEW

We review a summary judgment *de novo*. *J-B Weld Co. v. Gorilla Glue Co.*, 978 F.3d 778, 788 (11th Cir. 2020).

## III. DISCUSSION

We divide our discussion into three parts. First, we explain that Melton failed to provide substantial evidence that racial animus motivated his termination. Second, we explain that Melton failed to present substantial evidence that his termination was causally connected to his complaints of racial discrimination. Finally, we explain that Melton provided substantial evidence of a racially hostile work environment.

*A.  I-10 Was Entitled to Summary Judgment on Melton's Claim of a Racially Discriminatory Termination.*

Section 1981 and Title VII of the Civil Rights Act of 1964 both prohibit intentional racial discrimination in employment contracts. *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022). The parties do not dispute that at-will employment is contractual under section 1981, and we assume it is for the purpose of this appeal. We employ the same analysis under section 1981 as we would use under Title VII. *Id.* An employee must prove "(1) intentional racial discrimination (2) that caused a contractual injury." *Ziyadat v. Diamondrock Hosp. Co.*, 3 F.4th 1291, 1296 (11th Cir. 2021).

To establish intentional racial discrimination, an employee may rely on either direct evidence or circumstantial evidence. *Id.* If the employee "presents direct evidence that, if believed by the jury,

would be sufficient to win at trial," summary judgment is inappropriate. *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 922 (11th Cir. 2018) (citation and internal quotation marks omitted). But "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." *Id.* (citation and internal quotation marks omitted). If, by contrast, the employee relies on circumstantial evidence to support his claim, "we generally apply the *McDonnell Douglas* burden-shifting framework." *Jenkins*, 26 F.4th at 1249; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973) (describing the burden-shifting framework); *Tex. Dep't of Cmty. Affs. V. Burdine*, 450 U.S. 248, 252–56 (1981) (clarifying and further discussing the *McDonnell Douglas* framework). Of course, an employee may always prove a claim of discrimination by presenting sufficient evidence that would "permit[] a reasonable factfinder to find that the employer [discriminated] against the employee," even if they do not rely on this burden-shifting framework. *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1310–11 (11th Cir. 2023). We have often called this "rearticulation of the summary judgment standard" the "convincing mosaic" metaphor. *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946 (11th Cir. 2023), *cert. denied*, No. 23-1235 (Oct. 7, 2024); *see also Berry*, 84 F.4th at 1311 (emphasizing that the "'convincing mosaic' is a metaphor, not a legal test and not a framework").

Melton contends that he presented direct evidence of racial discrimination in his termination. He argues that if a decisionmaker with racial animus against a protected group fires a

member of that group, that fact alone is sufficient to support a jury's verdict that racial animus motivated the firing. He identifies Jason Brigman as a decisionmaker and Andrews as someone who influenced the decision to terminate him. A non-decisionmaker's racial animus can be direct evidence of discrimination if "the plaintiff shows that the harasser employed the decisionmaker as her 'cat's paw'—i.e., the decisionmaker acted in accordance with the harasser's decision without herself evaluating the employee's situation." *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998).

Neither Andrews nor Jason Brigman qualifies as a decisionmaker with racial animus. Although it is clear from Andrews's April 10 email that he wanted Melton to be fired, Melton has presented no evidence that Andrews controlled the decision to fire him. Melton relies primarily on Jason Brigman's statement to Andrews that I-10 planned to "get rid" of him, but "had to do it the right way" as evidence that Andrews was the puppet master. But Brian Brigman had already rebuffed Andrews's recommendation to fire Melton. And when Brian Brigman decided to terminate Melton's employment, he did so without Andrews. Melton also points to Jason Brigman's August 6 instruction to Andrews to "get a game plan" to dismiss Melton. But this fact does not prove Andrews controlled the decision—at best, it proves that he was an instrument of Jason Brigman. Melton nevertheless asserts that "Andrews influenced the termination decision." But he has provided no evidence that Brigman's decision was a "rubber stamp" for Andrews's

23-14175                Opinion of the Court                11

recommendation. *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999).

Jason Brigman is plausibly a decisionmaker, cat's paw or not. Regardless of his lack of official authority, he communicated with Andrews and Melton about business matters and attended the August 6 disciplinary meeting by phone. His involvement in personnel matters is more than enough for a jury to infer that he was a decisionmaker.

But Melton offers no direct evidence that Jason Brigman harbored racial animus against him. His direct evidence is confined to Andrews's use of racially discriminatory language. The record reflects—at most—that Jason Brigman used discriminatory language toward customers, but not toward Melton, and not in relation to Melton's termination. Melton's proposed rule—that evidence of general racial prejudice by a decisionmaker is *per se* direct evidence of discrimination—is foreclosed by our precedents. To constitute direct evidence, a "remark must indicate that *the employment decision in question* was motivated by race." *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227–28 (11th Cir. 2002) (emphasis added). Ordinarily, racist remarks not addressed to the complaining employee are not direct enough, *see Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1291 (11th Cir. 1998), nor are employee-directed remarks temporally remote from the employment decision, *see Scott*, 295 F.3d at 1227–28. So Jason Brigman's remarks are not direct evidence of discrimination as it pertains to Melton's termination.

Under the *McDonnell Douglas* framework, Melton must make a prima facie showing of discrimination in an adverse employment action. *Tynes*, 88 F.4th at 944. Then I-10 may provide a non-discriminatory motivation for the adverse action. *Id*. Melton must then prove that I-10's reasons are pretextual. *Id*.

Melton established a "rebuttable presumption of intentional discrimination." *Id*. He "belongs to a protected class" because he is black. *Id*. (citation and internal quotation marks omitted). His termination was "an adverse employment action." *Id*. (citation and internal quotation marks omitted). He was "qualified to perform the job in question." *Id*. (citation and internal quotation marks omitted). Finally, I-10 did treat "'similarly situated' employees outside [his] class more favorably" because he was replaced by a white employee. *Id*. (citation and internal quotation marks omitted). We have held that an employee can prove this element by "showing that she was replaced by someone outside of her protected class." *Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1322 n.6 (11th Cir. 2023) (alteration adopted) (citation and internal quotation marks omitted).

In turn, I-10 provided legitimate reasons for his termination. I-10 recorded Melton's failure to perform to its expectations in several ways, including communication and paperwork failures. The August 6 meeting was motivated by a major customer complaint. Instead of contesting that these issues were legitimate justifications for his firing, Melton argues that I-10 is inconsistent because it maintains both that it did not fire him but also offers race-neutral

reasons for his firing. Whatever surface appeal this argument may have, it carries no weight before us. I-10 is free to raise defenses in the alternative. FED. R. CIV. P. 8(d)(2). And it is not bound in doing so by a requirement of internal consistency. *Id*. R. 8(d)(3); *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1273–74 & n.14 (11th Cir. 2009). In any case, I-10's position is consistent here: I-10 argues that a jury could find that Melton either resigned or was fired.

Drawing all inferences in Melton's favor, we assume he was fired. Because a jury finding that Melton was fired would entail that it was motivated by something, I-10 then provides an additional, consistent argument that the reasons it relied on were racially neutral. This concession does not force I-10 to present both arguments "to a jury." Parties are not bound to summary-judgment concessions at fact-finding. *See McCullough v. Antolini*, 559 F.3d 1201, 1202 (11th Cir. 2009) (noting that "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case" (citation and internal quotation marks omitted)). Instead, I-10 can make whichever arguments it thinks are strongest before a jury, without being required to "draw[] all reasonable inferences in the light most favorable to the non-moving party." *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002).

Because I-10 articulated legitimate, non-discriminatory reasons for its conduct, Melton cannot prevail under the *McDonnell Douglas* framework unless he identifies substantial evidence that I-10's proffered reasons were pretextual. Melton fails to satisfy this burden. He again relies on the purported inconsistency between I-

10's assertion that Melton resigned and its concession that he was fired for purposes of summary judgment. He suggests that I-10's position is pretextual because I-10 cannot have fired him for legitimate reasons if it did not fire him at all. Although we have held that an employer's shifting explanations for an adverse action can prove pretext, *see Bechtel Constr. Co. v. Sec'y of Lab.*, 50 F.3d 926, 935 (11th Cir. 1995), I-10's position has not shifted. I-10 has litigated consistently in this posture by conceding to Melton a disputed fact at the summary-judgment stage. Because Melton has pointed to no other evidence that the firing was pretextual, his argument fails at this step.

Melton last turns to the convincing mosaic metaphor, but it too is unavailing. He argues that Andrews's and Jason Brigman's "frequent use and tolerance of racially inflammatory language . . . are sufficient to establish their racial animus," which, combined with I-10's claim that Melton quit, establishes discriminatory intent. But the same evidence placed in a looser frame does not transform it into something new. *Cf. Tynes*, 88 F.4th at 947 (explaining that the analysis under both the *McDonnell Douglas* framework and the "convincing mosaic" metaphor "turns on the substantive claims and evidence in the case"). Melton has failed to prove that Andrews was a decisionmaker or that any racially charged remarks by Andrews or the Brigmans were connected to his firing. No reasonable jury could find that he was a victim of discrimination in his termination.

### B. I-10 Was Entitled to Summary Judgment on Melton's Claim of Racially Discriminatory Retaliation.

Claims of retaliation under section 1981 are reviewed "under the same framework as Title VII claims." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc). We apply the *McDonnell Douglas* framework and consider, in the alternative, whether the employee has presented a convincing mosaic of circumstantial evidence of retaliation. *See Berry*, 84 F.4th at 1307. To survive summary judgment, Melton must present "evidence [that] permits a reasonable factfinder to find that the employer retaliated against the employee" for protected activity, such as complaining about discrimination. *Id.* at 1311. Under *McDonnell Douglas*, Melton may do so by presenting a prima facie case that his termination was causally connected to protected conduct. *Id.* at 1307. I-10 may then rebut the presumption by providing "legitimate, non-discriminatory reason[s]" for his termination. *Gogel*, 967 F.3d at 1135. Melton must then prove that these reasons were pretextual. *Id.*

To establish causation, Melton must prove "that '[his] protected activity was a but-for cause of the alleged adverse action by the employer.'" *Id.* (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)). "In other words, a plaintiff must prove that had []he not engaged in the protected conduct, []he would not have been fired." *Id.* (alteration adopted) (citation and internal quotation marks omitted). Circumstantial evidence such as "close temporal proximity" can support a finding of causation. *Joseph v. Bd. of Regents of Univ. Sys. of Ga.*, 121 F.4th 855, 871 (11th Cir. 2024)

(quoting parenthetically *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1352 (11th Cir. 2022)).

Melton cannot satisfy his burden. In addition to his termination, Melton argues that Andrews's alleged promotion in April 2021 and his write-up after his argument with Andrews were adverse actions. Even if we assume that Melton makes a prima facie causal case, I-10 proffers non-discriminatory reasons for the alleged adverse actions. Regarding his termination, I-10 points to a track record of erroneous paperwork and failed communication. Andrews's purported promotion can be justified by Andrews's greater experience, and the write-up of Melton is justified on its face by the heated disagreement Melton had with Andrews. Because I-10 has ample evidence of misconduct, any retaliatory inference would be "strained" at best. *Joseph*, 121 F.4th at 873.

And Melton has not offered substantial evidence of pretext. He first relies on I-10's assertion that he quit. But as explained above, I-10 is free to make arguments in the alternative at summary judgment. Indeed, because we draw all inferences in Melton's favor, I-10 is all but required to do so on any disputed issue. He also argues that some of the Brigmans' statements and the timing of their actions are evidence of pretext: specifically, Jason Brigman's statement that they planned to get rid of him "the right way," coupled with the timing of Andrews's promotion. But to prove pretext, a "plaintiff must prove that the reason was false." *Joseph*, 121 F.4th at 872 (citation and internal quotation marks omitted). Unless coupled with evidence that the proffered reasons were so "weak[],

implausib[le], inconsisten[t], incoheren[t], or contradict[ory]" that a "reasonable factfinder could find them unworthy of credence," none of Melton's arguments establish pretext. *Patterson*, 38 F.4th at 1352 (citation and internal quotation marks omitted). As it is, Melton does "not disagree with the validity" of I-10's complaints. That alone is dispositive. Melton cannot satisfy his burden under *McDonnell Douglas*.

The convincing mosaic framework does not rescue him either. Melton must still "put forward enough evidence for a reasonable jury to conclude that illegal discrimination occurred." *McCreight v. AuburnBank*, 117 F.4th 1322, 1334 (11th Cir. 2024). He has not done so.

## C.  *Melton Presented Substantial Evidence to Support His Claim of a Hostile Work Environment.*

We judge claims of racially hostile work environments under section 1981 by the same standard we apply to the same claims under Title VII. *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1334 (11th Cir. 2023). The first court to recognize a race-based hostile work environment claim was our predecessor, the Fifth Circuit, in 1971. Frances Baillon & Michelle Gibbons, *Race-Based Hostile Work Environment Claims in Federal and Minnesota Courts: A Historical Perspective on the Development of the "Severe or Pervasive" Standard*, 48 MITCHELL HAMLINE L. REV. 863, 867 (2022). In *Rogers v. EEOC*, Judge Goldberg wrote that Title VII "should be accorded a liberal interpretation . . . to eliminate the inconvenience, unfairness, and humiliation of ethnic discrimination." 454 F.2d 234, 238 (5th Cir.

1971). Title VII constitutes a "charter of principles which are to be elucidated and explicated by experience, time, and expertise." *Id*. A "working environment[] so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers" could alter the "terms, conditions, or privileges of employment." *Id*. (citation and internal quotation marks omitted).

*Rogers* proved pivotal in the parallel development of sexual harassment law. We recognized eleven years after *Rogers* that "[s]exual harassment . . . is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality." *Henson v. City of Dundee*, 682 F.2d 897, 902 (11th Cir. 1982). Both race- and sex-based claims could be made without a showing that the plaintiff "suffered tangible job detriment." *Id*.

The Supreme Court agreed with both *Rogers* and *Henson* in *Meritor Savings Bank, FSB v. Vinson*, where it explained that "sufficiently severe or pervasive" sexual harassment could "alter the conditions of the victim's employment." 477 U.S. 57, 66–67 (1986) (alterations adopted) (citation and internal quotation marks omitted). The Court distinguished this claim from a quid-pro-quo claim based on "tangible" economic harm, since a harassment claim could arise from "discriminatory intimidation, ridicule, and insult," even if the harasser never initiated an adverse action. *Id*. at 64–65. The Court declined "to issue a definitive rule on employer liability," but suggested that inferior courts look to the common law of agency. *Id*. at 72.

Later caselaw refined these standards, which would apply to claims of both sex- and race-based harassment. *Harris v. Forklift Systems, Inc.*, clarified that the environment must be both "objectively" and "subjectively" hostile but need not "seriously affect employees' psychological well-being." 510 U.S. 17, 21–22 (1993). Instead, any "work environment abusive to employees" based on protected characteristics "offends Title VII's broad rule of workplace equality." *Id*. at 22. In evaluating these claims, courts must look to the whole situation, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. at 23.

The Supreme Court held later that the objective harassment inquiry should be evaluated "from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances," including the "social context in which particular behavior occurs and is experienced by its target." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (citation and internal quotation marks omitted). That same year, the Supreme Court held that employers were presumptively liable for supervisor harassment unless they could prove that they "exercised reasonable care to prevent and correct" harassment, and that the employee "failed to take advantage of any preventive or corrective opportunities provided by the employer." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). These same standards apply to racial harassment claims. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 n.10 (2002).

To prevail on a claim against his employer for a racially hostile work environment, an employee must first prove that "he is a member of a protected class," and that he was subjected to "unwelcome" harassment "based on his race." *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1248–49 (11th Cir. 2014). He then must prove "that the harassment was severe or pervasive enough to alter the terms and conditions of his employment." *Id.* at 1249. Finally, he must prove that "the employer is responsible for the environment." *Id.* We have been clear that "the objective element" of the "severe or pervasive" inquiry is "not subject to mathematical precision," but is judged "from the circumstantial facts." *Bryant v. Jones*, 575 F.3d 1281, 1297 (11th Cir. 2009).

An employee may prevail by showing "[e]ither severity *or* pervasiveness." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) (en banc). An environment may be unlawfully hostile "even if the racial remarks were not directed at [the employee]." *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1522 (11th Cir. 1995). Nevertheless, as Title VII "is not a civility code," mere profanity does not suffice to show a hostile environment unless, "viewed cumulatively," the vulgarity amounts to race-based harassment. *Reeves*, 594 F.3d at 807.

I-10 meaningfully contests only whether the harassment Melton faced was sufficiently severe or pervasive to alter the conditions of his employment. Melton points to Andrews's use of the term "boy" in the April 9 conversation, the use of racial slurs and other derogatory language in reference to dark-skinned customers,

and the fact that Andrews did not want to serve nonwhite customers whom he either ignored or sent to Melton. Together, this evidence is enough for a jury to infer a hostile workplace environment.

A jury could reasonably find that Andrews used the term "boy" as a racial slur. We have held that "boy" can be a racial slur when directed at an adult black man. *See Ash v. Tyson Foods, Inc.*, 664 F.3d 883, 897–98 (11th Cir. 2011). Since a "speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage," whether this use was racially charged is a question the jury could decide either way. *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006). But one instance of a racist comment does not itself render a workplace hostile unless the comment is sufficiently severe to make up for the absence of pervasiveness. *See Adams*, 754 F.3d at 1254 (holding that an isolated act could assist in establishing hostility because "it was severe"); *cf. Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017) (holding that "one such instance" of a supervisor's use of the n-word "can suffice to state a claim"). Here it is not, and so we turn to the other evidence.

A jury could also reasonably rely on the evidence of pervasive hostility toward nonwhite customers. The district court ruled out Melton's statements about these comments because they were "vague as to frequency or pervasiveness." It is true that we have previously rejected harassment claims for insufficient specificity. *See Yelling*, 82 F.4th at 1335. But where we have done so, it has been

because the employee suggested vaguely that racist comments had been made multiple times. *Id*. Melton, in contrast, has provided specific evidence that the Brigmans and Andrews routinely used racial slurs toward dark-skinned customers and made other, charged comments about them in his presence. They described Indians as "dot heads" and Middle Easterners as "rag heads," and used other racial slurs to describe Asian and Hispanic customers. Melton states that employees' use of racial slurs was a "normal practice" at I-10, since it occurred "nearly every time" a nonwhite customer entered, which happened "frequently." This evidence is sufficient for a reasonable jury to find that these comments were pervasive.

The jury would be on firm ground to infer from these comments that Andrews and the Brigmans were hostile to all dark-skinned or nonwhite customers and employees. Hostile work environment claims turn on "a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Oncale*, 523 U.S. at 82. Because Melton was the only nonwhite employee at I-10, he was forced into an out-group—one that could have included any nonwhite person, who would in turn have been targeted based on his or her race. In that environment, the routine targeting of any nonwhite customer by a dominant white majority could reasonably make the environment hostile for a black employee. Our conclusion is reinforced by the fact that Andrews and the Brigmans regularly confirmed that their prejudices extended to black customers, by questioning the source of a black customer's money "[n]early every time" a black customer paid with

cash. And in using a racial slur to his face, Andrews confirmed what a reasonable person in his position could have concluded long ago: that Melton too was disfavored because of his race.

To be clear, we do not adopt a categorical rule that any minority employee alleging a hostile work environment may rely on remarks targeted at other racial minorities. Instead, we hold only that when an employee belongs to a minority group relative to his specific workplace, the treatment of other non-majority groups may evidence a strong racial preference for the workplace majority such that all minorities are racially disfavored. In that environment, prejudice against other minority groups can evidence the workplace majority's in-group preference, which in turn results in out-group bias. Employees must still establish that they were subject to at least some harassment based on their own race. Title VII is not a "civility code" to save employees from offense at the vulgarity and cruelty of others. *Reeves*, 594 F.3d at 807. But it protects Melton when he faces a workplace majority's racial bias.

Melton has also provided other evidence that he was treated differently in a racially charged way. He has stated that Andrews attempted to avoid serving nonwhite customers and tried to force Melton to serve them instead. This practice provides evidence of prejudice directly against him. And evidence that Melton was referred to with racist language behind his back adds to the credibility of his allegations. Although we do not consider "other employees' experiences of which [Melton was] unaware" in establishing the hostility of a workplace, *Adams*, 754 F.3d at 1250, these experiences

support an inference that Melton was telling the truth about the racist comments and actions he witnessed.

Melton has also provided substantial evidence that his performance at work was affected. He declared that the offensive remarks made by Andrews and the Brigmans were "a source of stress and anxiety that made it more difficult for [him] to do [his] job." A jury is entitled to credit his testimony, especially when I-10 has not disputed it. The district court questioned this assertion because "Melton's sales performance was unaffected and largely consistent through his entire employment." But a jury could infer that the harassment affected Melton's performance throughout his employment or prevented him from improving his performance. Because Melton has provided substantial evidence to put that question to a jury, the district court erred in granting summary judgment against his claim of a hostile work environment.

## IV. CONCLUSION

We **AFFIRM** the summary judgment in favor of I-10 on Melton's claims of disparate treatment and retaliation and **VACATE** the summary judgment on the claim of a racially hostile work environment and **REMAND** for further proceedings.

23-14175               ABUDU, J., Concurring                    1

ABUDU, Circuit Judge, Concurring:

I agree with the majority opinion in full.  I write separately to acknowledge that the district court's ruling and the dissent's position, in some important and disturbing ways, expose the shortcomings in our jurisprudence around the factual circumstances necessary to support a hostile work environment claim.

In concluding that the conduct Melton alleged was not sufficiently severe or pervasive, the district court acknowledged that the comments at issue were "certainly offensive and have no place in the work environment."  Yet, the district court felt constrained by our prior decisions—some of which are more than two decades old—in concluding that Melton's claims were not sufficiently analogous to the limited breadth of conduct we previously have deemed sufficiently severe or pervasive.  The district court's analysis is not an isolated occurrence.  An examination of how district courts in our Circuit have adjudicated hostile work environment claims over even the past five years reveals an unfortunate trend: judges frequently acknowledge that an employer or employee's conduct was racist or demeaning, or generally hostile, but nonetheless dismiss a plaintiff's hostile work environment claim at the summary judgment stage because they determine that the conduct was not severe or pervasive *enough* to alter the terms and conditions of employment.[1]

---

[1] *See, e.g., Harris v. Pub. Health Tr. of Miami-Dade Cnty.*, 82 F.4th 1296, 1305 (11th Cir. 2023) (affirming denial of hostile work environment claim despite finding that supervisor's comment that "blacks are lazy and don't like to work" was

2                    ABUDU, J., Concurring                    23-14175

In perpetuating this trend, we risk sanctioning conduct that does in fact, "alter the terms, conditions, or privileges of employment" in direct contravention of Congress's purpose and aims in enacting Title VII.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973) ("The language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens.").   We also risk depriving plaintiffs of the

---

"ignorant and extremely demeaning" in part because comments were not as "severe as the remarks that courts have found created hostile environments"); *Bailey v. DAS N. Am., Inc.*, 473 F.Supp. 3d 1310, 1330–31 (M.D. Ala. 2020) ("The Eleventh Circuit has examined and rejected hostile environment claims with far worse allegations."); *Bryant v. Norfolk S. R. R.*, No. 5:20-cv-00225-TES, 2022 WL 264874, at *9 (M.D. Ga. Jan. 27, 2022) (finding that coworker's comments, such as "I'm going to rape you" and "how about I put my dick in your mouth," when viewed "in the aggregate" did not satisfy the hostile work environment severity standard based on relevant case law because "[n]umerous courts in this circuit have found behavior significantly more egregious . . . not to be severe enough to support a hostile work environment claim"); *Booth v. Pasco Cnty., Fla.*, 829 F.Supp. 2d 1180, 1189 (M.D. Fla. 2011) (concluding that although "racially insensitive comments and behavior" directed towards plaintiff were "surely discriminatory and offensive" they were not severe enough to state a claim for a hostile work environment, in light of the fact that the Eleventh Circuit has dismissed hostile work environment claims "alleging significantly more serious conduct"); *Estelle v. Simpson Trucking & Grading, Inc.*, No. 2:17-cv-00273-RWS-JCF, 2020 WL 13653836, at *9 (N.D. Ga. Feb. 3, 2020), *report and recommendation adopted,* 2020 WL 13653842 (N.D. Ga. Mar. 23, 2020) ("While the conduct was certainly offensive and demeaning . . . the comments [plaintiff] endured were not as severe as those endured by other female plaintiffs whose hostile work environment claims have survived summary judgment.").

opportunity to present their cases to juries, who are best suited to resolve the factual questions which help answer the legal sufficiency question.

## I.    Narrow Interpretation of our Caselaw Sets an Impermissibly High Bar for Plaintiffs.

We consistently have held that, to successfully bring a hostile work environment claim, a plaintiff must prove that the harassment was, in relevant part, "sufficiently severe or pervasive to alter the terms of employment." *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1334 (11th Cir. 2023). To that end, we have "identified a nonexhaustive list of factors to delineate a minimum level of severity or pervasiveness necessary for harassing conduct." *Id.* at 1335 (quotations omitted). "Those factors are (1) the conduct's frequency, (2) its severity, (3) whether it was physically threatening or humiliating, rather than mere offensive utterances, and (4) whether it unreasonably interfered with the employee's job performance." *Id.* (alteration adopted) (quotations and citations omitted). No single factor is dispositive. Instead, we have adopted a "totality of the circumstances approach," relying on each factor to guide the court's inquiry. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002); *see also Copeland v. Georgia Dep't of Corr.*, 97 F.4th 766, 775 (11th Cir. 2024).

While it is rare that a single incident can satisfy the severity standard, we previously have held that the one-time use of a racial slur directed at a plaintiff can be sufficient for a reasonable jury to conclude that the harassment was severe. *See Smelter v. S. Home*

*Care Servs., Inc.*, 904 F.3d 1276, 1286 (11th Cir. 2018) (finding that singular instance of employee calling plaintiff a "dumb black nigger" was sufficient for a reasonable jury to conclude that the harassment was severe); *cf. Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1251–57 (11th Cir. 2014) (finding that Black employees who only *overheard* White coworkers saying "nigger" and did not provide any evidence that the word was directed to them could not establish a hostile work environment, even though they provided evidence of frequently seeing racist graffiti in employee bathrooms).

Additionally, we have found that racist and derogatory language is sufficiently severe when it rises above simply "overhearing [an] occasional off-handed comment in the course of casual conversation," but instead is directed at a plaintiff in "an intimidating manner," or when the alleged harasser uses such language when they are arguing with, mad at, or taunting the plaintiff. *Miller*, 277 F.3d at 1277 [2]; *see also Smelter*, 904 F.3d at 1286; *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1303–04 (11th Cir. 2012).

As to pervasiveness, we similarly have not identified a minimum number of times conduct must occur for it to be considered

---

[2] In *Miller*, a Mexican-American employee brought a hostile work environment claim based on allegations that a coworker repeatedly called him ethnic slurs, such as "wetback," "Spic," and "Mexican Mother F------." 277 F.3d at 1273, 1276–80. We affirmed the district court's denial of the employer's motion for judgment as a matter of law, in part, on the basis that there was sufficient evidence presented at trial to establish that the racial slurs directed at Miller rose beyond the occasional off-handed comment. *Id.* at 1276.

pervasive. *See Miller*, 277 F.3d at 1276 (concluding that there is no "magic number of racial or ethnic insults" that are indicative of a hostile work environment). For example, in *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, we concluded that a radio show employee's ability to point to "roughly fifteen separate instances of harassment" from her co-host and program director—including repeated comments that she "had a sexy voice," "inappropriately rubb[ing] his body parts against [her]," and "pull[ing] his pants up in an obscene manner [to] reveal an imprint of his private parts"—"over the course of four months" demonstrated that the harassment was sufficiently frequent. 234 F.3d 501, 506–09 (11th Cir. 2000) (reversing district court's grant of summary judgment against plaintiff in sexual harassment suit). However, in *Mendoza v. Borden, Inc.*, we held that five instances of alleged harassment, which included a male supervisor making a "sniffing sound" while looking at a female employee's groin on multiple occasions, telling her that he was "getting fired up" and "rubbing his hip against [her] hip," over an eleven-month period were too infrequent to demonstrate pervasive conduct. 195 F.3d 1238, 1247–49 (11th Cir. 1999).

Since then, our jurisprudence has, in some ways, operated between these two benchmarks. In *Fernandez v. Trees, Inc.*, for example, we determined that a jury could find the harassment was pervasive where the plaintiff's coworkers identified more than ten specific examples of their supervisor's racist comments about Cubans, such as referring to them as "shitty Cubans," "fucking Cubans," and "crying, whining Cubans," which ultimately led plaintiff

to unsuccessfully attempt suicide at the job site by dousing himself with gasoline and reaching for a lighter. 961 F.3d 1148, 1153 (11th Cir. 2020) (reversing grant of summary judgment against plaintiff in Title VII hostile work environment case after concluding that material issues of fact existed as to whether harassment was objectively severe or pervasive while citing *Johnson*). Recently, in *Copeland*, we held that the harassment directed against a transgender prison guard, such as frequent jokes about "having a 'dildo' in 'her' pants," repeated pushing, and being referred to as "it," "that," and "ma'am" on facility-wide radio communications, was sufficient for a jury to find pervasiveness where there was testimony that the harassment occurred daily for "at least a year," and plaintiff provided a seven-page list of seventeen "enumerated occurrences." 97 F.4th at 776–79 (citing *Johnson, Fernandez,* and *Mendoza*).

Notably, in our assessment of whether a juror could conclude that the harassment in each of these cases was pervasive, there has been insufficient discussion of the particularities of each work environment, the methods by which the harassing conduct was communicated to a plaintiff, and the nuances in communication between the plaintiff and the alleged offender. *See, e.g., McCann v. Tillman*, 526 F.3d 1370, 1378–79 (11th Cir. 2008) (finding that instances of racially derogatory language, which included references to a former Black employee as a "nigger bitch," calling Black male employees "boy," and a direct reference to plaintiff, a Black woman, as "girl," were "too sporadic and isolated" to be pervasive where comments were made over a period of more than

23-14175                    ABUDU, J., Concurring                    7

two years); *cf. Buckley v. Sec'y of Army*, 97 F.4th 784, 796–97(11th Cir. 2024) (finding that employer was not entitled to summary judgment on plaintiff's hostile work environment claim where racial harassment was in furtherance of scheme to divert White patients away from plaintiff who was the only Black female provider at the clinic).

The severity and pervasiveness of harassment are evaluated by the objective, reasonable person standard, and the inquiry is fact-specific. The particularities of a given job, as well as the conditions surrounding a plaintiff's interactions with the alleged wrongdoer(s), can all impact a reasonable juror's assessment of what constitutes objectively severe or pervasive conduct, such that the conditions of employment are altered. *See Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 23 (1993) ("[W]hether an environment is 'hostile' . . . can be determined only by looking at all the circumstances."). While it is true that Title VII is not a general civility code, we must ensure that our jurisprudence is aligned with Congress's determination that employees have a "right not to suffer conditions in the workplace that [are] disparately humiliating, abusive, or degrading." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 813 (11th Cir. 2010) (*en banc*). Ensuring that each case employs a truly independent, case-by-case analysis of the facts and circumstances, as opposed to analysis by rote comparison, ensures that we advance Congress's goal. Therefore, our precedent should not be read as creating stringent requirements about what counts as severe or pervasive conduct.

8                          ABUDU, J., Concurring                   23-14175

II.    **Our Jurisprudence Should Better Protect Against**
       **More Subtle Forms of Hostility.**

Although the standard by which hostile work environment claims are evaluated has remained consistent, our understanding of what type of conduct can satisfy that standard often fails to recognize the evolving and more sophisticated ways in which micro and macroaggressions enter the workplace to create hostile environments. The majority opinion correctly notes the "pivotal" nature of *Rogers v. EEOC*, which acknowledged that Title VII (and by extension, Section 1981) "should be accorded a liberal interpretation . . . to eliminate the inconvenience, unfairness, and humiliation of ethnic discrimination." 454 F.2d 234, 238 (5th Cir. 1971). *Rogers* also was especially groundbreaking given its anticipation of the changing societal norms which have forced expressions of racism, sexism, homophobia, and other biases to be more subtle but just as harmful, if not more, given the gaslighting associated with such behavior.[3] *Id.* at 239.

In *Rogers*, the Fifth Circuit concluded that "Congress's intentional decision to define discrimination in the broadest possible terms revealed that it knew that constant change is the order of our day and that the seemingly reasonable practices of the present can

---

[3] David Roby, *Words That Are Beyond Opprobrious: Racial Epithets and the Severity Element in Hostile Work Environment Claims*, 8 How. Scroll: Soc. Just. L. Rev. 37, 64–65 (2005) (finding that, while Title VII has been credited with promoting the decrease in overt racism, it also has been credited with fostering more subtle forms of discrimination).

23-14175                ABUDU, J., Concurring                9

easily become the injustices of the morrow." *Id.* at 238. More than twenty years later, the Supreme Court echoed *Rogers's* instruction in *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998). There, in ruling that sex discrimination consisting of same-sex sexual harassment was actionable under Title VII, the Supreme Court emphasized that a court's inquiry into the severity of harassment "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Id.* The Court stated that:

> [t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context will enable courts and juries to distinguish between simple teasing . . . and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

*Id.* at 82.

Thus, while the standard has not changed, our understanding of the type of behavior that meets that standard—as well as our understanding of the emotional distress such behavior has on an employee—must certainly evolve to meet the context-specific time in which we live. [4]

---

[4] *Cf. also Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (addressing the meaning of "cruel and unusual punishment" as defined in the Eighth Amendment as

10                    ABUDU, J., Concurring                    23-14175

Nevertheless, a review of our jurisprudence in this area reveals that we have fallen far behind changes in society, as our reliance on outdated understandings of "severe" and "pervasive" conduct has produced a stagnancy that will only continue to affect the most marginalized workers. *See Yelling*, 82 F.4th at 1333, 35–37 (concluding that while the racist comments a Black nurse overheard her White colleagues make, such as referring to Black patients as "boy" and "crack heads" and "welfare queens," undoubtedly did not belong in any workplace, the statements were not severe enough or "so objectively offensive as to alter the conditions of her employment"); *see also Harris*, 82 F.4th at 1305 (affirming denial of hostile work environment claim in part because there was no evidence that the conduct at issue "unreasonably interfered with [plaintiff's] job performance" despite evidence that supervisors "micromanaged and excessively monitored [plaintiff's] work, solicited peers to report on her violations, [and] made her perform clerical duties"); *Alexander v. Opelika City Schs.*, 352 F. App'x 390, 393 (11th Cir. 2009) (unpublished) (finding that harassment was not severe or pervasive where plaintiff was called "boy" at least eight times over the course of two years by his supervisor and coworkers, and his supervisor made a comment about "how to tie a noose around a person's neck"). Consequently, district courts consistently find that only the most egregious and overt displays of harassment regularly directed at a plaintiff can satisfy the evidentiary

---

requiring compatibility "with the evolving standards of decency that mark the progress of a maturing society").

23-14175              ABUDU, J., Concurring                    11

burden, or even create a material issue of genuine fact.  To the extent our precedent reasonably can be read to narrowly limit the overarching types, extent, and duration of unlawful behavior, such rulings or such applications run afoul of the Supreme Court precedent discussed above, as well as common sense and evolving understandings of professionalism and overall decency in the workplace.

The type of overt discrimination required in our existing hostile work environment jurisprudence continues to create unrealistic demands because such blatant discrimination is increasingly less common in the workplace.  While it remains unacceptable to engage in overtly racist, sexist, or other discriminatory behavior, this does not mean that there are fewer hostile work environments. On the contrary, "evidence supports the contention that structural racism and subtle, interpersonal racism remains widespread in the [United States]."  Courtney L McCluney, et al., *Structural Racism in the Workplace: Does Perception Matter for Health Inequalities*, 199 SOC. SCI. MED. 106, 114 (2018).  Importantly, Title VII and other antidiscrimination laws are intended to address covert, not just overt, forms of hostility.[5]

Our failure to acknowledge these more subtle forms of discrimination is evident in the frequent minimization of

---

[5] *See* Tristin K. Green, *Discrimination in Workplace Dynamics: Toward a Structural Account of Disparate Treatment Theory*, 38 HARV. C.R.-C.L. L. REV. 91, 95 (2003).

12                    ABUDU, J., Concurring                    23-14175

microaggressions.[6]  Despite the implied triviality of the name, the impact of microaggressions is anything but micro.[7]  Just like more overt discrimination, "microaggressions" in the workplace can be extremely harmful to an employee's ability to do their work because they "lead to a sense of rejection . . . [and] pose as acts of dehumanization."  Jennifer Feitosa, Aaliyah Marie Almeda & Teslin Ishee, *Microaggressions in the Workplace: A Guide for Managers,* MERITS, (Feb. 5, 2026, at 10:15 ET) at 1, 7, https://doi.org/10.3390/merits5020010, [https://perma.cc/5VEV-9EV2].  While these microaggressions do not always arise from the type of blatant

---

[6] The term "Microaggressions" herein is defined as "brief and commonplace daily, verbal, behavioral, and environmental indignities, whether intentional or unintentional, that communicate hostile, derogatory, or negative racial slights and insults to the target person or group."  Aisha M. B. Holder, Margo A. Jackson & Joseph G. Ponterotto, *Racial Microaggression Experiences and Coping Strategies of Black Women in Corporate Leadership*, 2 QUAL. PSYCH. 164, 165 (2015); *see also* Katherine E. Leung, *Microaggressions and Sexual Harassment: How the Severe or Pervasive Standard Fails Women of Color*, 23 TEX. J. C.L. & C.R. 79, 100 (2017) ("[M]icroaggressions are an implicit communication of the actor's racist or sexist beliefs, whether or not the actor is even aware of those beliefs.").  The EEOC has "challenged courts to reconsider [their] conceptualizations of . . . discrimination" in the hostile work environment context, going as far as filing amicus briefs in support of petitions for rehearing in cases where a plaintiff's hostile work environment claims were dismissed.  Eden B. King, et al., *Discrimination in the 21st Century: Are Science and the Law Aligned*, 17 PSYCH. PUB. POL'Y & L. 54, 59 (2011).

[7] *See* Sam Goldstein, *Are Any Aggressions Really Micro*, PSYCH. TODAY, (Mar. 16, 2025), https://www.psychologytoday.com/us/blog/raising-resilient-children/202503/are-any-aggressions-really-micro?msockid=16a83c3404ed61360cb32abf059d60c8 [https://perma.cc/UTW2-6VCU].

23-14175                    ABUDU, J., Concurring                    13

or conscious discriminatory intent we typically have found sufficient at summary judgment, the impact of these forms of aggression can be just as harmful.  *See generally* Eden B. King, et al., *Discrimination in the 21st Century: Are Science and the Law Aligned*, 17 PSYCH. PUB. POL'Y & L. 54, 72 (2011) ("[D]espite their subtlety, microaggressions are acts that do not go unrecognized by employees . . . Judges, however, seem to hold higher standards in their evaluations of discrimination . . . [T]here is a disconnect in the perceptions of targets of discrimination and the arbiters of justice . . . .").

This can lead to "antisocial responding behaviors by those facing microaggressions, which, in turn, can impact their work outcomes." *Id.*  This, by definition, "alter[s] the terms, conditions, or privileges of employment . . . ." *McDonnell Douglas,* 411 U.S. at 800. That is why many of the cases discussed herein contain hostile work environment claims based in some part on an employee's experience with these sorts of microaggressions in the workplace.[8]

Yet, while there is "extensive literature document[ing] their harmful effects . . . [on] workplace participation," our precedent all but ensures that an employee's experience with microaggressions will not give rise to a cognizable hostile work environment claim. Suzanne B. Goldberg, *Harassment, Workplace Culture, and the Power and Limits of Law*, 70 AM. U. L. REV. 419, 471 n.167 (2020) (collecting sources identifying harms of microaggressions for employees).

---

[8] *See, e.g., Estelle*, 2020 WL 13653836, at *9; *Chambers v. City of Lakeland*, No. 8:20-CV-2794, 2022 WL 2356816, at *10 (M.D. Fla. Jun. 30, 2022).

This disincentivizes employers from addressing and preventing these microaggressions, as they are unlikely to face any legal consequences. *Id*. at 470.

Our precedent has not kept up with these changes. However, that does not prevent us from reevaluating our understanding of severe or pervasive conduct on a case-by-case basis. Failure to do so will have significant consequences for workers from protected backgrounds, as caselaw will continue to fall further behind common sense and decency.

III.   **Jury Avoidance Through Defendant-Friendly Summary Judgment Rulings Is a Barrier to Creating a More Nuanced and Contemporary Understanding of What Constitutes Severe or Pervasive Misconduct.**

A final point is that jurors generally are better suited to conduct these fact-specific inquiries.[9] Otherwise, resolving cases at the summary judgment stage based on what a single judge does not consider severe or pervasive, as opposed to a jury of the plaintiff's peers who come from a variety of workplaces and life experiences, grossly limits the concept of what a "reasonable person would find hostile or abusive." *Oncale*, 523 U.S. at 81 (internal citation omitted). This expanding practice of resolving material issues of fact at the summary judgment stage deprives plaintiffs from having their

---

[9] *See* Roby, *Words That Are Beyond Opprobrious*, at 48–49 ("For some analysts there is no question that this is a fact specific issue that should be handled by a jury, which could evaluate the claim using the community norm. The alternative would be evaluation by a relatively 'isolated' judge.").

23-14175                    ABUDU, J., Concurring                    15

claims heard by jurors who are less influenced by outdated standards of acceptable conduct. *Contrast Moeinpour v. Bd. of Trustees of Univ. of Ala.*, 762 F. Supp. 3d 1129, 1150 (N.D. Ala. 2025) (denying motion for judgment as a matter of law where jury found coworker's repeated use of racial slurs created a hostile work environment), *with Smart v. City of Miami Beach, Fla.*, 933 F. Supp. 2d 1366, 1376 (S.D. Fla 2013) (granting motion for judgment as a matter of law and reversing jury verdict in favor of female firefighter's hostile work environment claim where court disagreed with jury and determined that harassing conduct was "insufficient to maintain a sexual harassment hostile work environment claim under [our] jurisprudence").

Courts should not feel uncomfortable acknowledging the significance of personal and professional gaps in one individual judge's frame of reference when determining what a reasonable person would find hostile or abusive when deciding whether a case should proceed to trial. Otherwise, courts simply will continue the mechanical application of Title VII to discrimination claims as opposed to the nuanced considerations juries arguably are more prone and best suited to address.

23-14175    BRANCH, J., Concurring and Dissenting in Part    1

BRANCH, J., concurring in part and dissenting in part:

Clennon Melton appeals the district court's grant of summary judgment to his employer on his claims of unlawful termination and hostile work environment.  I agree with the Majority that Melton failed to support his claims of discriminatory or retaliatory termination, so the grant of summary judgment was appropriate. I disagree, however, that the facts he has alleged could suffice for him to prevail on his hostile work environment claim before a jury. I therefore dissent from the Majority's conclusion that the district court erred in granting summary judgment on that claim.

## I.    Background

The Majority sets forth in full the facts underlying this appeal.  I highlight here those facts that are arguably relevant to Melton's hostile work environment claim.[1]

Clennon Melton is a black man who worked for I-10 Truck Center as a truck salesman from March 2020 through August 2021. Melton was the only black employee at I-10; all other employees were white.  During his employment, Melton was supervised by Brian Brigman, who owns and operates I-10, and Jason Brigman, who also ran the business.  Melton worked alongside Joseph

---

[1] When reviewing a district court's grant of summary judgment, we "draw[] all inferences in the light most favorable to the non-moving party." *Sutton v. Wal-Mart Stores E, LP*, 64 F.4th 1166, 1168 (11th Cir. 2023) (quotations omitted).  For the facts supporting Melton's hostile work environment claim, I rely primarily on Melton's own declarations filed in opposition to the motion for summary judgment.

Andrews, who was also employed as a truck salesman until the Brigmans made him Melton's manager after April 9, 2021.

During his employment, Melton noticed that the Brigmans and Andrews "regularly made disparaging comments in [his] presence about nonwhite customers." He "heard Brian Brigman refer[] to dark-skinned customers from India as 'dot heads'" and "Andrews refer[] to dark-skinned customers from the Middle East as 'rag heads.'" He asserted that "[i]t was a normal practice for the Brigmans, Mr. Andrews, and employees in the parts department to use racially offensive language when discussing customers of color." Andrews also avoided serving nonwhite customers, either by ignoring them or telling Melton to take care of them.

Melton further alleged that "[n]early every time black customers made cash purchases," Andrews and the Brigmans would "imply[] that the black customer must have gotten the money from an illegal activity," but they made no such comments about white customers using cash. Jason Brigman also told Andrews "on more than one occasion" that nonwhite foreign customers would pretend not to understand English but later would speak perfect English when discussing payment, a stereotype that offended Melton. Melton stated that such disparaging comments were made "nearly every time a nonwhite customer entered I-10," and "the disturbing nature of the offensive remarks" and their frequency "made it more difficult for [him] to do [his] job."[2]

---

[2] Aside from Melton's vague declarations that the Brigmans and Andrews "regularly" made these offensive comments in his presence and that nonwhite

23-14175   BRANCH, J., Concurring and Dissenting in Part          3

On April 9, 2021, Melton and Andrews were involved in an altercation over a sales commission. Melton asserted that during their argument, Andrews said, "Boy, you'd better get out of my office." Melton understood the word "boy" when used in this way to be a racial slur, and immediately reported the language, along with other offensive comments, to Brian Brigman. Melton asserted that he "did not like the racist work environment at I-10 and felt it was unbearably stressful." Later, during discovery in this case, Melton learned that another employee had called him "THAT N[*****]"[3] in a Facebook Messenger group that included other employees.[4]

After Melton's employment at I-10 ended, he filed the instant suit against Brian Brigman, Jason Brigman, and I-10, bringing claims of employment discrimination, hostile work environment,

---

customers "frequently" entered I-10, there is no evidence showing how often these comments occurred in the thirteen months that Melton worked there.

[3] While the evidence itself was uncensored, we have censored the use of this racial slur throughout the opinion.

[4] The Majority mentions that in May 2021, Melton's attorney e-mailed the Brigmans and Andrews, alleging that Melton had overheard the Brigmans referring to a customer and to Melton as "stupid n*****s" on a phone call and claiming the customer was willing to testify to that effect. Notably, although Melton included this allegation in his complaint in this action, he did not testify to it in his declarations or in the excerpts of his deposition included in the record, nor has he pointed to any other evidence backing this claim. And at oral argument, Melton's counsel conceded there was no evidence Melton ever heard the word "n*****" being used in the workplace. I therefore do not consider this alleged incident in my analysis.

4          BRANCH, J., Concurring and Dissenting in Part  23-14175

and retaliation.  After discovery, the defendants moved for summary judgment on all claims, and the district court granted that motion.  This appeal followed.

## II.    Discussion

"We review a district court's decision on summary judgment *de novo* and . . . draw[] all inferences in the light most favorable to the non-moving party."  *Sutton v. Wal-Mart Stores E, LP*, 64 F.4th 1166, 1168 (11th Cir. 2023).  Summary judgment is proper if the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[A] mere scintilla of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (*en banc*) (quotations omitted).

A plaintiff bringing a hostile work environment claim must prove that (1) he "belongs to a protected class," (2) he "experienced unwelcome harassment," (3) "the harassment was based on [his] race," (4) "the harassment was sufficiently severe or pervasive to alter the terms of [his] employment," and (5) the employer was responsible "under a theory of vicarious or direct liability." *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1334 (11th Cir. 2023).  The fourth element—the severity or pervasiveness of the harassment—includes both a subjective and objective component. *Id.* at 1335. "Specifically, the employee must subjectively perceive the harassment as sufficiently severe and pervasive and this subjective

23-14175    BRANCH, J., Concurring and Dissenting in Part         5

perception must be objectively reasonable." *Id.* (alteration and omission adopted) (quotations omitted).  At the summary judgment stage, we accept that Melton subjectively perceived that the harassment was severe or pervasive. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1299 (11th Cir. 2012).  Accordingly, my focus is on whether the evidence Melton presented "constitute[s] severe or pervasive harassment from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* (quotations omitted).

For two reasons, Melton has failed to show that his subjective perception that he experienced severe or pervasive harassment based on his race was objectively reasonable.  First, the conduct Melton alleges was not severe, nor were his allegations specific enough to show the harassing conduct was pervasive.  Second, Melton relies primarily on comments directed at other individuals of other races, evidence which we have not previously found relevant.

A.      *The evidence does not support that the alleged conduct was severe or pervasive*

We have "identified a nonexhaustive list of factors to delineate a minimum level of severity or pervasiveness necessary for harassing conduct." *Yelling*, 82 F.4th at 1335 (quotations omitted).  "Those factors are (1) the conduct's frequency, (2) its severity, (3) whether it was physically threatening or humiliating, rather than mere offensive utterances, and (4) whether it unreasonably interfered with the employee's job performance." *Id.* (alteration

adopted) (quotations omitted).  "[N]o single factor is dispositive." *Jones*, 683 F.3d at 1299.  Melton does not argue that the conduct was physically threatening, and the Majority agrees that none of the conduct was severe.[5]  So for Melton to succeed, he must present sufficient evidence from which a jury could reasonably conclude that the harassment was frequent enough to pervade his work environment.

Melton points to a number of examples of conduct to support his claim that he experienced pervasive harassment: (1) the altercation during which Andrews called Melton "boy"[6]; (2) Andrews's and the Brigmans' use of racial slurs such as "dot head" and "rag head" and other slurs for Asian and Hispanic customers in Melton's presence; and (3) Andrews's and the Brigmans' practice of

---

[5] Because conduct need not be both severe *and* pervasive to survive summary judgment, lack of frequency may be excused when the harassing conduct is extreme.  *See Yelling*, 82 F.4th at 1336 (concluding that the plaintiff "ha[d] not cited evidence that her coworkers' conduct was so extreme as to make up for the infrequency"); *Adams v. Austal, U.S.A., L.L.C*, 754 F.3d 1240, 1248 (11th Cir. 2014) (allowing claims to proceed to trial that were supported by allegations of severe harassment).

[6] Melton argues that Andrews calling him "boy" was a "severe example of harassment" that was particularly problematic because it was "uttered by a supervisor, as I-10 claims Andrews to be."  *See Copeland v. Ga. Dep't of Corr.*, 97 F.4th 766, 777 (11th Cir. 2024) ("Harassment is also more severe when it involves the participation of supervisors rather than solely peers or subordinates.").  I agree with the Majority's conclusion that this single comment was not sufficiently severe to support Melton's claim on its own.  I note, in addition, that Melton insists that Andrews was not his manager until after this incident occurred.

23-14175  BRANCH, J., Concurring and Dissenting in Part          7

implying that cash payments from black customers must have come from illegal activity.  The Majority also cites "the fact that Andrews did not want to serve nonwhite customers whom he either ignored or sent to Melton."

But aside from Melton's testimony about Andrews calling him "boy," his allegations lack the specificity our caselaw has previously required.  In past cases, we have required plaintiffs (1) to specifically allege when or how often harassment occurred and (2) to provide specific instances of such conduct rather than relying on generalized allegations.  For example, in *Yelling*, we concluded that the plaintiff's allegations were insufficiently specific regarding how often racially hostile conduct occurred. 82 F.4th at 1335.  The plaintiff, a black woman, testified that her workplace "became 'kind of heated' with racist comments" and that "her coworkers generally made racist comments multiple times."  *Id.*  The plaintiff offered a few examples of the types of remarks she had overheard, such as comments that "Michelle Obama looks like a monkey" and that President Obama "needs to go back to Africa."  *Id.* at 1333.  Some coworkers "refer[red] to black patients as 'boy' or 'girl,' 'crack heads,' 'welfare queens,' or 'ghetto fabulous'" while others referred to themselves as "confederate flag flyers."  *Id.*  Upon reviewing the evidence, we concluded that the plaintiff's testimony that "coworkers generally made racist comments multiple times . . . lack[ed] the specificity necessary to show frequency."  *Id.* at 1335.  As an example of the kind of specificity required, we pointed to *Fernandez v. Trees, Inc.*, noting that the employee's testimony that "harassment occurred 'every other day' or 'nearly every day' . . . was more

8          BRANCH, J., Concurring and Dissenting in Part  23-14175

specific than vague testimony [that] harassment occurred 'constantly.'" *Id.* at 1335–36 (citing *Fernandez v. Trees, Inc.*, 961 F.3d 1148 (11th Cir. 2020)).

A plaintiff must also provide evidence of specific instances of harassment. In *Fernandez*, we relied on the fact that the plaintiff's specific allegations of frequency were accompanied by "more than 10 specific examples of discriminatory remarks made" over a period of two months. *Fernandez*, 961 F.3d at 1153. Both requirements—specific frequency and specific instances—must be met. We have thus affirmed summary judgment against plaintiffs even when their allegations generally described the type of racially hostile behavior they observed. For example, in *Adams v. Austal, U.S.A., L.L.C.*, we concluded that a plaintiff's evidence was insufficient to "raise a disputed issue concerning his work environment" when he "'saw a lot' of racist graffiti in two of the men's restrooms and saw white employees' paraphernalia with the Confederate flag" and also alleged "three specific instances of racial harassment," including hearing a coworker use the word "n*****" and having a coworker call him "boy." 754 F.3d 1240, 1256–57 (11th Cir. 2014). We concluded that the "incidents of racial harassment" he alleged "were offensive," but they were not pervasive. *Id.* at 1257. Another plaintiff whose claims likewise failed testified he saw coworkers wear Confederate flag attire "on a regular basis," saw racist graffiti in the bathroom "on a daily basis" and heard people say "n*****" "a 'few times' over two years." *Id.* at 1254. Once again, we determined that "a reasonable jury would not find that his workplace was objectively hostile." *Id.*

23-14175   BRANCH, J., Concurring and Dissenting in Part        9

While our opinion in *Adams* did not explicitly reject these claims for being insufficiently specific (simply concluding that, "[c]onsidering the totality of the circumstances, a reasonable jury would not find that [the plaintiff's] workplace was objectively hostile," *id.* at 1254), the allegations we deemed insufficient in *Adams*—notwithstanding the plaintiffs' ability to offer a few specifics and the indisputable offensiveness of the alleged behavior—bear a striking resemblance to Melton's allegations in this case.[7] Melton's testimony fails to allege specifically how often harassing conduct occurred or to offer sufficient specific examples.[8] Melton has asserted that certain racially hostile comments were made "regularly,"

---

[7] Notably, for each of the plaintiffs whose claims we allowed to proceed to trial in *Adams*, we concluded a jury could find that the harassment they experienced was both frequent *and* severe. *See* 754 F.3d at 1251–54.

[8] Melton argues that the district court "erred by substituting its desire for a precise tally of racist remarks for a view of the evidence that a jury could reasonably take." But in making this argument, Melton relies on cases from the Second and Third Circuits and the District of Vermont—none from this Court, and none binding on this Court. And for good reason, because other hostile work environment decisions from this Court demonstrate that Melton falls short of the kind of specificity we have previously found sufficient for a jury to find pervasiveness. *See, e.g.*, *Copeland v. Ga. Dep't of Corr.*, 97 F.4th 766, 776–77 (11th Cir. 2024) (finding a jury could reasonably conclude that harassment was frequent based on plaintiff's testimony that the harassment occurred "daily" for "at least a year" and a seven-page list of 17 "enumerated occurrences" the plaintiff described as "major incidents"); *Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276, 1286 (11th Cir. 2018) (finding a jury could conclude harassment was severe and pervasive when coworker called the plaintiff a "dumb black n[*****]" and the plaintiff provided quotes of specific racist comments directed at her and other black people "on a daily basis").

10          BRANCH, J., Concurring and Dissenting in Part  23-14175

"routinely," "often," or "on more than one occasion."  He goes on
to say that disparaging comments were made "nearly every time a
nonwhite customer entered I-10."  But he does not specify how of-
ten such customers visited, beyond saying it was "frequently."  He
similarly alleges that Andrews would refuse to serve nonwhite cus-
tomers, who "frequently entered I-10 to inquire about trucks."
These statements involve just the sort of vague, generalized lan-
guage regarding frequency that we have previously rejected as in-
sufficiently specific.  *See Yelling*, 82 F.4th at 1335–36 (distinguishing
between allegations that harassment occurred "nearly every day"
and more vague allegations that harassment occurred "con-
stantly").[9]

Nor does Melton provide specific instances of his general-
ized allegations of racially hostile conduct.  Aside from once being

---

[9] Melton relies on *Fernandez* for the proposition that "evidence of harassing
conduct 'nearly every day' was sufficiently specific to establish a hostile work
environment," but he ignores that our discussion in *Fernandez* focused on the
"more than 10 specific examples" the plaintiff offered, while he has offered
only one sufficiently specific example—the altercation during which Andrews
called him "boy." *Fernandez*, 961 F.3d at 1153.

The majority similarly claims that Melton *has* "provided specific evidence":
namely, that the Brigmans and Andrews "described Indians as 'dot heads' and
Middle Easterners as 'rag heads,' and used other racial slurs to describe Asian
and Hispanic customers" and that "employees' use of racial slurs was a 'nor-
mal practice' at I-10, since it occurred 'nearly every time' a nonwhite customer
entered, which happened 'frequently.'" But these allegations are specific only
about the racial slurs used; they offer no details about any particular incident
and tell us nothing about the frequency with which such comments were
made, as our previous cases have required. *See Yelling*, 82 F.4th at 1335–36.

23-14175   BRANCH, J., Concurring and Dissenting in Part    11

called "boy" by Andrews,[10] Melton does not pinpoint a single specific example of *any* of his allegations. Melton's allegations thus "lack[] the specificity necessary to show frequency." *Yelling*, 82 F.4th at 1335. Absent specific frequency and specific instances, Melton's allegations are vague and would not suffice for "a reasonable jury to find in [his] favor." *Id.* at 1329.[11]

---

[10] And Melton made clear in his deposition that this happened only once.

[11] I note that Melton (and the Majority) cannot shore up his claim with evidence of which Melton was not aware until discovery in this case. Specifically, Melton argues that Andrews's use of the word "boy" was clearly a racial slur aimed at him because Andrews "had a history of using the N-word to describe black people in general and Melton in particular." The Majority, for its part, asserts that the racial language used behind Melton's back in the Facebook Messenger group "support[s] an inference that Melton was telling the truth about the racist comments and actions he witnessed."

While the Majority is correct that the word "boy" is a racial slur when directed at an adult black man, our assessment of that one incident, or of the evidence generally, cannot be influenced by statements of which Melton was not aware. *See Adams*, 754 F.3d at 1250 (concluding that "a district court should not consider . . . evidence that the plaintiff did not know about . . . in evaluating the objective component of a claim of a hostile work environment"). For example, in *Adams* we were reviewing the appeals of 13 plaintiffs against whom summary judgment had been granted, and 11 other employees had brought similar hostile workplace claims which the district court had allowed to proceed to trial, all against the same employer. *Id.* at 1245. Many of the employees alleged harassment that was quite severe. *See id.* at 1251 (recounting, for example, one plaintiff's allegations that she had "discovered a noose in the breakroom"; a "supervisor pretended to masturbate in front of her while telling her that a racist and perverse drawing of her appeared in the men's restroom" and she later saw the drawing; she heard white employees call "black employees 'boy' on 'many' occasions" and "once heard someone say over the work walky-talky system, 'Send some monkeys over here'"; and she saw white

12          BRANCH, J., Concurring and Dissenting in Part  23-14175

B.          *Much of the alleged conduct was not based on Melton's race*

Setting aside the vagueness of Melton's allegations concerning the frequency of the offensive comments, the evidence does not support Melton's hostile work environment claim because much of the alleged conduct was directed at others and was not based on Melton's race.  Melton argues that hostile comments directed at any nonwhite race would make the workplace environment hostile for him, a nonwhite employee, so evidence of such conduct is relevant to his claim.  But he has identified only one easily distinguishable case where we relied on harassment about a *different* race or ethnicity to support a hostile work environment claim.  In *Jones v. UPS Ground Freight*, the plaintiff, a black man, alleged that his work instructor referred to him as an Indian, and when the plaintiff told the instructor he was not an Indian, the instructor said, "I don't care what race you are, I trained *your kind* before."  683 F.3d at 1299 (emphasis in original).  We determined that because the supervisor "could have been directing a slur at [the plaintiff] based on his dark complection or some other perceived shared characteristic with Native Americans," a reasonable trier of

_____

employees wear the Confederate flag on clothing and accessories "every morning" (alteration adopted)).  Even in that context, where 24 different employees alleged significant and sometimes severe harassment against the same employer, we still determined that the district court properly "limited its consideration to incidents of racial harassment of which" each individual employee was aware.  *Id.* at 1250.  *Adams* makes clear that any evidence of racial hostility of which the plaintiff was not aware is irrelevant to a hostile work environment claim.

23-14175   BRANCH, J., Concurring and Dissenting in Part       13

fact could take this incident into account. *Id.* at 1300.  In other words, evidence of racially based harassing conduct aimed directly at the plaintiff was not irrelevant simply because the offender was mistaken about the plaintiff's race.[12]  Accepting such evidence as relevant is a far cry from saying that any racially hostile statements directed at others who are of a different race than the plaintiff can constitute harassment for purposes of a hostile work environment claim.  Racially hostile statements directed at other racial or ethnic minorities may certainly be offensive to a reasonable person.  But in the past, to find a hostile work environment claim rose to the level of severe or pervasive harassment based on the plaintiff's race, we have relied on harassing conduct that has some link to the plaintiff—either by referring to those of his own race or by being directed at him.

In this case, almost all of Melton's allegations involve deplorable racial statements about *other* individuals of *other* races.  Melton's only allegations of statements about those of his own race are the instance of Andrews calling him "boy" and the Brigmans' and Andrews's habit of questioning the source of black customers' cash payments.  The lack of any other harassing conduct based on

---

[12] Notably, though, we did not rely on this incident alone to allow the claim to proceed to trial; the plaintiff also alleged that he found banana peels on his delivery truck on four different occasions, that he saw individuals at his workplace wearing Confederate flag shirts or hats, and that shortly after reporting the banana incidents and Confederate flag paraphernalia, he was confronted in the workplace at night by two coworkers carrying metal tools who asked if he had reported them. *Jones*, 683 F.3d at 1300–01.

Melton's race undermines his claim.  *See id.* at 1297 ("Innocuous statements or conduct, or boorish ones that do not relate to the race of the actor or of the offended party (the plaintiff), are not counted." (alteration adopted) (quotation omitted)); *Terrell v. Sec'y, Dep't of Veterans Affs.*, 98 F.4th 1343, 1356 (11th Cir. 2024) ("The standards for judging hostility are intended to be sufficiently demanding to ensure that Title VII does not become a general civility code." (quotations omitted)).  Without sufficient allegations of severe or pervasive harassment targeting Melton or his race, summary judgment was appropriate.

### III.    Conclusion

For these reasons, I conclude that Melton's allegations are not sufficiently specific to support his hostile work environment claim.  Nor does he sufficiently allege severe or pervasive hostile comments toward himself or those of his race, to allow a jury to resolve this claim in his favor.  I therefore respectfully dissent from the Majority's conclusion that the grant of summary judgment on the hostile work environment claim should be vacated.